## TAYLOR ET AL. *v.* THE EQUITABLE TRUST COMPANY

[No. 242, September Term, 1972.]

*Decided May 23, 1973.*

150

The cause was argued before MURPHY, C. J., and BARNES, SINGLEY, SMITH, DIGGES and LEVINE, JJ.

*David Freishtat* for appellants.

*Joseph W. Janssens, Jr.,* with whom were *Miles & Janssens* on the brief, for appellee.

SINGLEY, J., delivered the opinion of the Court.

Although this case has overtones which are esoteric and sometimes bizarre, at the heart of the matter lies a relatively simple commercial transaction, a transfer of funds belonging to Robert L. Taylor, a plaintiff below and an appellant here, by The Equitable Trust Company (Equitable), which Taylor maintains was not authorized.

Through an intermediary, Taylor fell in with Elsa Yamin, who was represented to be the Ambassador of the Dominican Republic to the United Nations, and Frank Terranova, reputed to be a retired army general, who was Mrs. Yamin's financial adviser. Mrs. Yamin and Terranova persuaded Taylor that they were in a position to obtain for Trusco, Inc., a Canadian corporation controlled by Mrs. Yamin, a lease of the Hispaniola Hotel in the Dominican Republic, but that $300,000.00 would be required to consummate the transaction.

At the outset, it was agreed that Taylor would put up no money, but would provide the collateral to be used by Trusco in borrowing the necessary funds. In return, Taylor believed that he was to receive 60% of the stock of Trusco. Because Taylor had a criminal record, it was decided that he would

remain in the background.[1] Mrs. Yamin agreed to issue or sell the stock to Terranova, who in turn assigned his rights to a corporation controlled by Taylor. Allegedly for reasons of secrecy, the assignment appeared only on Taylor's copy of the agreement.

It would seem that Terranova was unable to borrow $300,000.00, and events took a new turn: $61,200.00 would have to be raised to secure the lease. The idea was that $20,000.00 would be provided by Taylor; $20,000.00 by George Gottlieb, an associate of Terranova's; and $20,000.00 by Terranova. Where the remaining $1,200.00 was to come from remains to this day an unanswered question.

On 13 February 1968, Mrs. Taylor, at her husband's direction, went to a branch of Equitable in suburban Baltimore where the Taylors had a joint checking account. There, she exhanged her check for $20,000.00 drawn on their account for a treasurer's check in the same amount, which was drawn to the order of:

> "Government of Dominican
> Republic in favor of
> Hispaniola Hotel
>
> Trusco Inc."

What brought this curious bit of phraseology about, and what it was supposed to mean, was never explained. As it turned out, it matters little whether Trusco was a joint payee, or whether its name was added to identify its interest in the transaction. In accordance with Taylor's instruction, the check was delivered to an airline stewardess for delivery to Terranova's courier, who was waiting in New York.

Sometime later in February, James W. Vittetoe, a second vice president of Equitable, received a telephone call from Miami from a person who represented himself to be Taylor, whom Vittetoe did not know.[2] The purpose of the call was to request that the $20,000.00 represented by the treasurer's

---

1. In 1957 or 1958, Taylor had been convicted of making a false oath in a bankruptcy proceeding and of mail fraud.

2. Taylor admitted that he was in Miami from 25 February to 1 March, but denied that he made the call.

check be transferred to the account of Jody Associates at Irving Trust Company in New York. Vittetoe was a loan officer, to whom such a call would not normally be routed. After consulting another officer, Vittetoe explained that this would require an instruction in writing from Taylor.

Thereafter, Vittetoe received the treasurer's check, which bore no endorsement, with the handwritten letter, bearing neither a date nor a return address:

"Dear Mr. Vittetoe:

Please exchange the attached check to be payable to Jody Associates or wire the sum of $20,000 to the Irving Trust Company, Woolworth Bldg., to Jody Associates.

Thank you on behalf of Mr. Robert Taylor.

Frank Terranova"

On 26 February, Equitable stamped the treasurer's check "not used for purpose issued" and transferred $20,000.00 to Irving Trust Company, to be credited to the account of Jody Associates.[3]

In June, 1968, Terranova called on Taylor for additional funds to bank the casino and stock the bar at the hotel. On 28 June, Taylor transferred by wire through Equitable an additional sum of $40,000.00 ($16,000.00 of which represented funds belonging to his children) to Royal Bank of Canada to the credit of Trusco, Inc.[4]

Within a matter of days (although unknown to Taylor until later) Trusco entered into a lease for the hotel. Sometime in the summer of 1968, Taylor went to the Dominican Republic, visited the hotel, and saw that it was under Trusco's management.[5] In November of 1968, Taylor went to Brazil and did not return until the fall of 1969, almost a year later. During Taylor's stay in Brazil, he

---

3. There was testimony that Jody Associates was an alter ego of Terranova.

4. It later developed that this account had been opened by Terranova, was subject to his signature, and was closed by his withdrawal of the $40,000.00.

5. Through Mrs. Yamin's good offices, Taylor had an interview with President Balaguer at the presidential palace.

received a telephone call from Martin Yamin, Elsa's husband, asking whether Taylor was interested in selling his interest. Taylor said that he was, for $60,000.00. Nothing came of this.

On his return from Brazil, Taylor called Yamin, who told him that Trusco's interest in the hotel had been sold, and that it was Terranova who had put up all the money to obtain the lease, with the result that Taylor had no interest in the matter. When settlement negotiations with Terranova and the new purchaser proved abortive, Taylor and his wife brought suit in the Circuit Court for Harford County against Equitable in November of 1970.[6] The declaration contained three counts: the first sounded in contract, and sought $20,000.00 in damages. The second alleged negligence, and sought compensatory damages of $20,000.00 and punitive damages of $100,000.00. The third alleged that because Equitable never informed Taylor of the diversion of the funds, he was induced to make the second payment of $40,000.00, as well as an investment of an additional $30,000.00 in another of Terranova's enterprises, for which $150,000.00 in damages were claimed.

The case was tried below without a jury, and resulted in a judgment in Equitable's favor for costs. Taylor and his wife, and their three minor children by their mother as next friend, have appealed to this Court.

The court below found that Equitable breached its contract with Taylor, and had acted in a negligent fashion when, under the circumstances of the case, it cancelled the unendorsed treasurer's check and transferred $20,000.00 to Irving Trust Company. The trial court concluded, however, that it was Taylor's negligence in not aggressively asserting his rights, and not Equitable's breach or its failure to use due care, which was the proximate cause of Taylor's loss. The court then endeavored to buttress this conclusion with a finding that the $20,000.00 transferred was used to purchase the lease, and therefore was ultimately used for the purpose which Taylor intended.

---

6. The three Taylor children were later joined as plaintiffs.

We do not see it quite that way. We regard the transaction as being largely governed by the Uniform Commercial Code (UCC) Maryland Code (1957, 1964 Repl. Vol.) Art. 95B. A good point of departure is found in a Comment in 2 Bender's U.C.C. Service, Hart and Willier § 12.35, at 12-129 (1972):

"Nowhere in the Code does it say in so many words that a bank, whether a collecting bank or payor bank, is liable for negligently paying an item. Hints, however, abound. They start with Section 1-103, providing that common-law rules of negligence still apply. Section 3-419(3) limits recovery against collecting banks for conversion only if they acted in good faith and followed 'reasonable commercial standards.' Section 3-406 precludes assertion of a material alteration or unauthorized signature against the party whose negligence substantially contributed to the wrongdoing, but only if the payor is a holder in due course or paid 'in good faith and in accordance with the reasonable commercial standards of the drawee's or payor's business.' A bank is prohibited from disclaiming 'responsibility for its own lack of good faith or failure to exercise ordinary care' under Section 4-103(1), apparently upon the assumption that such duties exist. Finally, a bank's lack of care shifts the burden for paying over a forged signature or a materially altered item from its customer who was negligent in discovering the wrongdoing, back to the bank under Section 4-406(3)."

The relation between a bank and its depositor is a legal one. It is broadly defined as being that of debtor and creditor, *Keller v. Fredericktown Sav. Institution*, 193 Md. 292, 296, 66 A. 2d 924 (1949), the rights of the depositor and the liability of the bank being contractual, *Pritchard v. Myers*, 174 Md. 66, 76, 197 A. 620 (1938), but *see* Note, *Negotiable Instruments: Payment of Materially Altered Checks: Bank Not Liable to Depositor in Tort*, 40 Cornell L.

Q. 795 (1955).[7] Unless modified by the parties the contract is that implied in a banking relationship, *Magness v. Equitable Trust Co.*, 176 Md. 528, 531, 6 A. 2d 241 (1939). For a breach of this contract, an action in tort will lie, *Siegman v. Equitable Trust Co.*, 267 Md. 309, 313, 297 A. 2d 758 (1972), following in the venerable footsteps of *Rolin v. Steward*, 14 C. B. 595, 139 Eng. Repr. 245 (1854) and *Marzetti v. Williams*, 1 B & AD 415, 109 Eng. Repr. 842 (1830).

While this line of cases dealt primarily with wrongful dishonor of a depositor's checks, we see no reason why the same general principles are not equally applicable to a wrongful disbursement of funds belonging to a depositor. *See General Apparel Sales Corp. v. Chase Manhattan Bank, NA*, 321 F. Supp. 891 (S.D.N.Y. 1970), where recovery was allowed when the bank accepted deposits of General Apparel's funds after the account had been closed. *See also* Note, 40 Cornell L. Q., *supra* at 801; Comment, *Bank Not Liable in Tort to Depositor for Honoring Forged or Altered Check*, 6 Syracuse L. Rev. 365, 367-68 (1955).

Subtitle 3 of the UCC is devoted to *Commercial Paper*. It is applicable here because the check of a bank treasurer or cashier is regarded as a draft drawn on the drawer bank, treated by UCC 3-118 (a) as a note and satisfies the requirements of UCC § 3-104. UCC § 3-403 (1) recognizes that the signature of an agent or other representative may be valid. Of course, the power to sign for another may be expressly given, or may be implied, or may rest on apparent authority: otherwise, the signature would be unauthorized under § 1-201 (43). *See Senate Motors, Inc. v. Industrial Bank of Washington*, 9 UCC Rep. 387, 391 (D.C. Sup. Ct. 1971). In *Forest Hill Permanent Bldg. Ass'n v. Fisher*, 140 Md. 666, 670, 118 A. 164 (1922), our predecessors, interpreting similar language in the Negotiable Instruments Law, observed that such a power will never be lightly inferred.

---

7. "The description of the banker-depositor relationship as one of debtor and creditor is basically correct. At the same time, however, it disregards the special characteristics of that relationship. The volume and importance of a bank's business with the public at large sets it apart from ordinary debtors. Its position as a financial institution commanding the trust and confidence of entire communities has been recognized in the need for legislative control of its activities." 40 Cornell L. Q. at 801.

An unauthorized signature is wholly inoperative under § 3-404 unless the person whose signature it purports to be ratifies it or is precluded from denying it. Under § 3-401 an item containing a forged or unauthorized signature is not properly payable. When these sections are taken together with § 4-401, the UCC codifies the underlying contract implied between the bank and its customer that the bank will charge any item which is "otherwise properly payable" against the depositor's account only on the order of the depositor or of someone authorized by him. *See Wiley v. Manufacturers Hanover Trust Co.*, 6 UCC Rep. 1083, 1084-85 (N.Y. Sup. Ct. 1969); Clark & Squillante, *The Law of Bank Deposits, Collections and Credit Cards* 135 (1970). However, a depositor whose account has been charged with an item containing an unauthorized signature may not only be precluded by § 3-404 (1) from denying the signature but may be precluded by § 3-406 from asserting the lack of authority against a drawee "who pays the instrument in good faith and in accordance with reasonable commercial standards" if the depositor's negligence has substantially contributed to the making of the unauthorized signature. *See Thompson Maple Products v. Citizens Nat'l Bank of Corry*, 211 Pa. Super. 42, 234 A. 2d 32, 34, 36 (1967); *Salsman v. Nat. Comm. Bank*, 102 N. J. Super. 482, 246 A. 2d 162, 168 (1968), *aff'd* 105 N. J. Super. 164, 251 A. 2d 460 (1969).

Subtitle 4, *Bank Deposits and Collections* of the UCC deals generally with bank transactions. It is expressly stipulated by § 4-103 (1) that the UCC provisions may be varied by agreement so long as "a bank's responsibility for its own lack of good faith or failure to exercise ordinary care" is not disclaimed. The measure of damages for failure to use ordinary care in handling an item is limited by § 4-103 (5) to the value of the item, reduced by the amount which could not have been realized had ordinary care been exercised, but if there had been bad faith on the part of the bank, other damage suffered as a proximate consequence may be recovered. In this regard, UCC § 1-201 (19) defines "good faith" as meaning "honesty in fact in the conduct or transaction concerned."

Under the facts of this case we are inclined to follow the

158

path taken by the Supreme Court of Oregon in *Gresham State Bank v. O and K Construction Co.*, 231 Ore. 106, 370 P. 2d 726, 100 A.L.R.2d 654 (1962), *opinion clarified, rehearing denied,* 231 Ore. 106, 372 P. 2d 187 (1962) which reserved for another day a determination whether UCC § 3-404 and Comment 4 and § 3-406 and Comment 6 mandate the weighing or the balancing of the negligence of the owner of a check with the negligence of the payor of the same check, to which an unauthorized endorsement had been added.[8] The court imposed liability as a matter of law on the payor, whose conduct failed to conform to the "reasonable commercial standards" of its business, when it cashed a check without making inquiry as to the agent's authority.

There is no doubt that Equitable was negligent in not insisting on written instructions from Taylor — Everett O'Brien, Equitable's operations officer, testified that this was customarily required — and in not verifying Terranova's authority to act for Taylor, if it proposed to act in reliance upon it.

It is significant that at the time of the return of the treasurer's check, Vittetoe had no idea who Terranova was. On deposition, Vittetoe said that he had made no effort to get in touch with Taylor after the receipt of the Terranova letter. At trial, he said that he had called Taylor before transferring funds to Irving Trust Company. Taylor denied receiving such a call, and Vittetoe was unable to establish, from Equitable's records, that such a call had been made. Nor was Vittetoe able to produce a file memorandum of the call, although he testified that he customarily made such notes.

Why Vittetoe did not tell Taylor to return the treasurer's check to be credited to his account, and suggest that Taylor send his own check, payable to Jody Associates, to Irving

8. *Compare* Salsman v. Nat. Comm. Bank, *supra* at 168; Exchange Bank & Trust Co. v. Kidwell Construction Co., 463 S.W.2d 465 (Tex. Ct. C. A. 1971), *aff'd* 472 S.W.2d 117 (Tex. Ct. 1971); 2 Anderson, Uniform Commercial Code, § 3-406:5 at 941 (1971) *with* Clark & Squillante, The Law of Bank Deposits, Collections and Credit Cards, *supra,* at 156; Note, Forgeries and Material Alterations: Allocation of Risks Under the Uniform Commercial Code, 50 Boston Univ. L. Rev. 536, 549-50 (1970).

Trust Company is but another of the unanswered questions posed by this case.

Even if Taylor's claim were not limited to $20,000.00 by § 4-103 (5), because while the bank's conduct may have been reckless, it certainly could not amount to bad faith ("[dis]honesty in fact"), we would be inclined to agree with the trial court that Equitable's failure to use care was not the cause of Taylor's loss of the later payment of $40,000.00 and much less the cause of his loss of $30,000.00 which he turned over to Terranova in an unrelated transaction. The two subsequent losses meet neither the fair and reasonable result test nor the foreseeability test of *Hadley v. Baxendale*, 9 Exch. 341 (1854). For a recent application, *see St. Paul at Chase v. Mfrs. Life Insur. Co.*, 262 Md. 192, 253, 278 A. 2d 12 (1971).

However, the lack of care certainly caused the loss of the $20,000.00. The trial court's finding that "the Twenty Thousand Dollar treasurer's check indisputably was used to purchase [the] lease" was clearly erroneous, Maryland Rule 886, and its reliance on *Coplin v. Maryland Trust Co.*, 222 Md. 119, 123, 159 A. 2d 356 (1960), demonstrably inapposite — the $20,000.00 check was to meet Taylor's share of the amount to be paid by Trusco to the Dominican Republic, not, as it turned out, to fund Terranova's participation in the transaction. It definitely was not used for the intended purpose, as was the case in *Coplin. See also Blomquist v. Zions First Nat'l Bank NA*, 18 Utah 2d 65, 415 P. 2d 213, 215-16 (1966); 2 Anderson, *Uniform Commercial Code, supra*, 3-404:13 at 927.

Equitable would have us hold that Taylor is estopped or precluded from asserting his claim, relying on UCC § 3-404 (1):

> "Any unauthorized signature is wholly inoperative as that of the person whose name is signed unless he ratifies it or is precluded from denying it; but it operates as the signature of the unauthorized signer in favor of any person who in good faith pays the instrument or takes it for value."

and *Union Trust Co. v. Soble,* 192 Md. 427, 64 A. 2d 744 (1949). *Soble* dealt with Code (1939) Art. 13, § 42, the provision of the Uniform Negotiable Instruments Law which was the antecedent of UCC § 4-406 (1). The facts in *Soble* were that the depositor drew a check on 24 July which was cashed in consequence of an unauthorized endorsement. The depositor received his cancelled check from the bank on 1 August and delayed asserting a claim against the bank until he had unsuccessfully sought recovery from the payee and the endorser, a period of approximately three months. On these facts, our predecessors held that Soble was estopped or precluded from asserting a claim against the bank.

Had Taylor been apprised of the transaction by Equitable in February or March of 1968, it might well have been another story. In view of the fact that Taylor did not learn what had happened for two years, it can hardly be said that Equitable's position was prejudiced by a further delay of six months. The point which Equitable makes is that Taylor's failure to assert a claim against Equitable until his negotiations with Trusco and Trusco's successor in title in the Hispaniola Hotel lease had aborted in some fashion precludes the assertion of the claim against Equitable. The truth of the matter is that there may well have been no claim against Equitable at all had the negotiations succeeded.

We do not find this persuasive. It is clear that the funds were diverted in February, 1968; that Taylor first learned of the diversion in February or March of 1970, and that suit was instituted in November of 1970. While UCC § 4-406 (4) in effect imposes a one-year limitation on actions based on unauthorized signatures (as distinguished from endorsements), commencing when the depositor receives a statement from the bank accompanied by the items to which it relates, it was Taylor's undisputed testimony that he had never been advised by Equitable of the treatment accorded the treasurer's check. Nor was his statement that he first learned in February or March of 1970 that the funds had been diverted controverted in any respect. Assuming that the provision of UCC § 4-406 (4) respecting unauthorized

signatures is applicable to the Terranova letter, suit was brought within one year of the time when Taylor first learned that the funds represented by the treasurer's check had been diverted. If, on the other hand, this were regarded as an unauthorized endorsement, § 4-406 (4) fixes the period of limitations as three years. Additionally, under § 4-406 (3), if a bank fails to use ordinary care in making payment, it cannot rely on its customer's failure to perform his postpayment duties under § 4-406 (1). For a case imposing liability on a drawee bank which paid cashier's checks bearing forged endorsements in a somewhat similar factual situation, *see Jerman v. Bank of America National Trust & Savings Assn,* 7 Cal. App. 3d 882, 87 Cal. Reptr. 88 (1970).

Both sides make much of the issue whether Terranova was or was not Taylor's agent. Certainly Taylor is not precluded by § 3-406 from asserting Terranova's lack of authority, because of Equitable's acknowledged failure to act in accordance with reasonable commercial standards, in making a transfer without a written direction from Taylor.

Taylor's statement that Terranova was not authorized to act for him, made in his direct testimony and again when Equitable called him as an adverse witness, went unchallenged. The existence of implied or apparent authority could only be bottomed on Terranova's letter, enclosing the check which, for all Vittetoe knew, might have been stolen. Even if we regard the letter as a representation by Terranova that he was authorized to act for Taylor, Equitable was not entitled to rely on Terranova's statement, without more, *Posko v. Climatic Control Corp.,* 198 Md. 578, 583, 84 A. 2d 906 (1951). In our view, Vittetoe's testimony regarding his telephone call to Miami was not enough to save the day, not only because of his equivocation and uncertainty, but because of his total disregard of even the simplest precautions to make sure that the voice at the other end was that of Taylor, a man whom he did not know.

Two comments seem particularly pertinent here:

> "A third person dealing with a purported agent should communicate with the principal to verify the agent's authority to sign. A written statement

from the principal as to the agent's authority may also aid in avoiding any subsequent dispute as to whether such authority existed, or whether the principal had made any statement as to the authority of the apparent agent." 2 Anderson, *Uniform Commercial Code, supra,* § 3-404:3 at 922.

In *Noah v. Bowery Sav. Bank,* 225 N. Y. 284, 155 N.Y.S. 1128, 122 N.E. 235 (1919), the court, in discussing the conduct of a savings bank, which permitted a withdrawal by a person other than the depositor who had possession of the passbook, said:

"Lack of suspicion cannot always be the determinative factor in paying out a depositor's money. Reasonable care might demand a suspicion where from habitual indifference none in fact existed." 122 N. E. at 237

What Judge Bond said, speaking for the Court in *Atlantic Trust Co. v. Subscribers, etc.,* 150 Md. 470, 475-76, 133 A. 319 (1926), is similarly apposite here:

"The controlling rule is that a principal can be bound by the acts of another as agent only so far as he, the principal, has empowered or permitted the other to represent him; and if the banker has been misled by an appearance of authority not known and acquiesced in by the principal, and so has accepted unauthorized endorsements, the banker is answerable for the loss."

*See generally P. Flanigan & Sons v. Childs,* 251 Md. 646, 653-54, 248 A. 2d 473 (1968); *Deane v. Big Spring Distilling Co.,* 138 Md. 388, 392-93, 113 A. 891 (1921); *Brager v. Levy,* 122 Md. 554, 561, 90 A. 102 (1914).

It is certainly true that agency could not be implied simply from Terranova's possession of the check, *Fidelity & Casualty Co. v. Hellenic Bank Trust Co.,* 181 Misc. 40, 45 N.Y.S.2d 43 (1943), *aff'd* 181 Misc. 44, 47 N.Y.S.2d 295 (1944). Moreover, *Maley v. Eastside Bank of Chicago,* 361 F. 2d 393 (7th Cir. 1966) is authority for the proposition that when a

bank permits items to be treated in a fashion which is in derogation of the depositor's contract (in that case the disbursement of funds belonging to a corporation on the signature of one officer when two signatures were required by the corporate resolution on file with the bank), the general principles of the law of agency are not available as a defense to the bank.

Judgment should have been entered in favor of Robert L. Taylor and Zena Taylor against Equitable for $20,000.00 and interest should have been allowed from 26 February 1968, *Atlantic States Construction Co. v. Drummond & Co.*, 251 Md. 77, 85, 246 A. 2d 251 (1968); *Affiliated Distillers Brands Corp. v. R. W. L. Wine & Liquor Co.*, 213 Md. 509, 516, 132 A. 2d 582 (1957).

> *Judgment reversed; judgment entered in favor of Robert L. Taylor and Zena Taylor against The Equitable Trust Company for $20,000.00 with interest from 26 February 1968.*
> *Costs to be paid by appellee.*