21 F.3d 421
 62 USLW 2608, 17 Employee Benefits Cas. 2585
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
THE CANDLEWOOD OBSTETRIC-GYNECOLOGIC ASSOCIATES, P.C.
Retirement Trust; Paul V. Digrazia, M.D., Trustee for the
Candlewood Obstetric-Gynecologic Associates, P.C. Retirement
Trust; Gerard J. Foye, M.D., Trustee for the Candlewood
Obstetric-Gynecologic Associates, P.C. Retirement Trust;
John McGrade, M.D., Trustee for the Candlewood
Obstetric-Gynecologic Associates, P.C. Retirement Trust;
Kevin Mitchell, M.D., Trustee for the Candlewood
Obstetric-Gynecologic Associates, P.C. Retirement Trust;
Anthony P. Borrelli, M.D., Plaintiffs-Appellants,
v.
RETIREMENT AND BENEFIT ANALYSTS, INCORPORATED; Maryland
National Bank; Bank of America NT & ST;
Prudential Securities Incorporated;
Signet Bank/Maryland; Steven
J. Burkowse,
Defendants-Appellees,
and
Legg Mason Wood Walker, Incorporated, Defendant.
 No. 93-1092.
 United States Court of Appeals, Fourth Circuit.
 Argued Sept. 30, 1993.
Decided March 14, 1994.
 
 Appeal from the United States District Court for the District of Maryland, at Baltimore. John R. Hargrove, District Judge. (CA-91-2581-HAR)
 Holly Nan Lindeman, BROCATO, PRICE & BUSHEL, P.A., Baltimore, Maryland, for Appellant.
 Ava Elaine Lias-Booker, WEINBERG & GREEN, Baltimore, Maryland, for Appellees Signet Bank, Bank of America and Maryland National Bank; Gilbert William Boyce, KUTAK, ROCK, Washington, D.C., for Appellee Prudential Securities.
 Francis S. Brocato, BROCATO, PRICE & BUSHEL, P.A., Baltimore, Maryland, for Appellant.
 Steven K. Fedder, WEINBERG & GREEN, Baltimore, Maryland, for Appellees Signet Bank, Bank of America and Maryland National Bank; Joseph A. Ingrisano, KUTAK, ROCK, Washington, D.C., for Appellee Prudential Securities.
 D.Md.
 AFFIRMED.
 Before MURNAGHAN and NIEMEYER, Circuit Judges, and SPROUSE, Senior Circuit Judge.
 OPINION
 PER CURIAM:
 
 
 1
 The Candlewood Associates P.C. Retirement Trust, its trustees, and a non-trustee participant instituted this diversity action against the pension plan's administrator, the plan's investment advisors, and three banks, alleging breach of contract and fiduciary duty by the plan administrator and the investment advisors and accusing the three banks of conversion. The district court entered a default judgment against the plan administrator, and the plaintiffs voluntarily dismissed their complaint against Legg Mason, one of the investment-advisor defendants. After full discovery, the district court granted summary judgment in favor of Prudential Securities, Inc., another investment advisor, on the breach of contract and breach of fiduciary duty claims. Summary judgment was simultaneously granted to the three defendant banks on the conversion claims. The plaintiffs appeal these summary judgment rulings.
 
 
 2
 * The record in this case reveals a somewhat unusual scenario in which an employee pension fund was loosely administered by two unrelated offices, leaving the head of one of these offices in a position to embezzle over one million dollars during a period of little more than three years.
 
 
 3
 The Candlewood Obstetric-Gynecologic Associates P.C. Retirement Trust ("Candlewood Trust") is an employee pension and benefit plan funded by contributions from Candlewood Obstetric-Gynecologic Associates P.C. ("Candlewood P.C.") for the benefit of Candlewood P.C.'s physicians and their medical and administrative employees. The Candlewood Trust is managed by four trustee-participants, Drs. Paul V. DiGrazia, Gerald J. Foye, John McGrade, and Kevin Mitchell. Dr. Mitchell was the trustee most involved with the management of the plan. Candlewood P.C.'s office manager, Dianne Fleischer, performed the more routine administrative tasks associated with the plan.
 
 
 4
 The assets of the Candlewood Trust consist of contributions made from the medical practice of Candlewood P.C. and accrued profits and earnings on those contributions. The plan does not have a bank account; rather, its funds are invested directly through a brokerage firm. In 1985 the plan transferred its funds to an account with Prudential Securities, Inc. ("Prudential"). Dr. Mitchell's brother, Stephen Mitchell, was the Prudential broker who established the plan's account. When the plan trustees expressed a need for a plan administrator to assist in the preparation of loan documents and materials needed to comply with the Employee Retirement Income Security Act of 1974, 29 U.S.C. Secs. 1001-1461 ("ERISA"), Stephen Mitchell recommended Steven Burkowske. The plan hired Burkowske, owner and operator of Retirement & Benefit Analysts, Inc. ("RBA"), to serve as plan administrator. There was no written contract setting forth the parameters of Burkowske's responsibilities with respect to the Candlewood Trust.
 
 
 5
 Under the provisions of the plan, participants could seek loans against their vested portion of the plan. As a matter of practice, participants applying for loans would initially contact Fleischer, the P.C.'s office manager. Fleischer would then request approval of such loans from one of the four trustees. Fleischer generally initiated the processing of loan checks by contacting Burkowske, who would then call Prudential to ask that a check be issued from the Candlewood Trust account. Burkowske prepared the paper work and amortization tables on the loans, and Prudential would issue a check payable either to Candlewood Trust or to a loan recipient. These checks were mailed to Burkowske, the appropriate plan participant, or to Fleischer at Candlewood P.C.
 
 
 6
 In September 1986 Stephen Mitchell left Prudential, and Richard Zink took over the Candlewood Trust account at that brokerage firm. Fleischer apparently disliked Zink so she began dealing only with Burkowske. By 1987 Burkowske had become the only avenue through which check requests were made to Prudential on behalf of loan recipients or others requiring disbursements from the plan.
 
 
 7
 In early 1987 Fleischer and the trustees became concerned about the length of time it was taking Prudential to send checks to the trustees or plan participants. In addition, after Stephen Mitchell's departure, Prudential would only make checks drawn on the Candlewood Trust account payable to the plan itself. Plan participants consequently encountered difficulty depositing their loan checks because their banks would not permit them to deposit checks payable to Candlewood Trust in their personal accounts.
 
 
 8
 To meet these problems, Burkowske, without receiving formal approval from the trustees, instituted the course of action that eventually led to his criminal diversion of trust funds and this attempt by the trustees to recover their losses. First, Burkowske established accounts at Signet Bank ("Signet") in the names of "Retirement & Benefit Analysts/Candlewood" and "Retirement & Benefit Analysts, Inc." Then, he constructed a system under which he was responsible for processing a participant's loan application, requesting payment from Prudential in the amount of the loan, and then issuing a check directly to the loan applicant from one of the RBA accounts at Signet. After issuing a check on the basis of Burkowske's request, Prudential would forward the check, payable to the plan, to either Burkowske or Fleischer. When Fleischer received checks, she would send them, apparently without restrictive endorsement, to Burkowske. Whether the checks were forwarded from Prudential or Fleischer, Burkowske endorsed them and deposited them into one of his Signet accounts as reimbursement for his payment to the loan recipient. Although this system enabled plan participants to deposit loan checks, it also opened the door for Burkowske's subsequent criminal behavior.
 
 
 9
 Burkowske's procedures, although not formally sanctioned by the trustees, were not concealed from them or from Fleischer. In fact, in September 1987, two of the trustees, Drs. Foye and McGrade, who had been required to cash out certain personal investments that had been commingled with the plan's funds, received their disbursements in the form of checks drawn on the RBA account at Signet. In November 1987, Burkowske sent Fleischer a letter enclosing a check for a plan participant drawn on the RBA account. Burkowske wrote Fleischer that he would have Prudential's Mr. Zink send her a check from the Prudential account, representing loan proceeds for the participant, and instructed her to forward Prudential's check to him so that he could deposit it into an escrow account. He also noted that the check from Prudential would be in an amount greater than the one Burkowske had issued to the plan participant. Burkowske explained that such an arrangement was, in effect, an advance of pension plan funds which he could disburse directly to any future loan applicants.
 
 
 10
 Burkowske also handled contributions to the plan. In 1986 and 1987, the Candlewood P.C. made five contributions to the plan. Each of these five checks was signed by an authorized member of Candlewood P.C. and made payable to RBA. Burkowske endorsed two of these checks over to Candlewood Trust and sent them to Prudential for deposit. However, he deposited three of the checks into one of the RBA accounts at Signet and kept the funds for his own use.
 
 
 11
 Eventually, Burkowske's embezzlement activities expanded. He began requesting checks from Prudential in amounts considerably in excess of those sought by plan participants and approved by the trustees. The excessively large checks, all made payable to Candlewood Trust, were deposited into Burkowske's RBA accounts at Signet. The potential for misconduct, which the trustees perhaps should have anticipated, materialized and Burkowske, through these arrangements, embezzled hundreds of thousands of dollars belonging to the pension plan. In addition, Burkowske embezzled the proceeds of loan repayment checks that had been made payable to the plan. In 1989, Candlewood Trust transferred its account to another investment firm, Legg Mason, where Stephen Mitchell was employed. Burkowske continued to steal funds belonging to the plan by endorsing and depositing into the RBA accounts Legg Mason and loan repayment checks that were written out to Candlewood Trust.
 
 
 12
 In May 1990, Burkowske finally made the error which alerted the trustees to his misconduct. The new broker, Legg Mason, had issued a check to pay a premium on an insurance policy purchased by the pension plan. The insurance company never received payment because Burkowske gained possession of the check and deposited it into his RBA account. Fleischer, notified by the insurance company of the trustees' nonpayment, contacted Stephen Mitchell at Legg Mason who, in turn, obtained a copy of Legg Mason's canceled check which showed that it had been deposited into Burkowske's account. Stephen Mitchell then told his brother, Dr. Kevin Mitchell, that Burkowske had deposited the insurance premium check in the RBA account. Even after this discovery, at least three more checks, payable to Candlewood Trust, were sent to Burkowske, endorsed by him, and deposited into his Signet account.
 
 
 13
 Candlewood Trust finally terminated its relationship with Burkowske when it was notified in 1991 that Burkowske was under investigation by the Federal Bureau of Investigation for embezzlement. Burkowske was indicted and convicted of embezzlement and is currently in federal prison. The Candlewood Trust, its four trustees, and Anthony P. Borelli, a plan participant, sued Burkowske and RBA on September 9, 1991, for breach of contract and fiduciary duties under Maryland law. These defendants failed to answer or otherwise defend the complaint, and the district court granted a default judgment against Burkowske and RBA on December 16, 1992.
 
 
 14
 The plan also brought suit against its investment advisors, Prudential and Legg Mason, accusing them of breach of contract and breach of fiduciary duty under the common law of Maryland for the investment firms' failure to safeguard the plan's assets. In the same complaint, the plan sued Signet, Bank of America,[1] and Maryland National Bank ("MNB")[2] for payment of Candlewood Trust checks on forged endorsements in violation of Md. Com. Law I Code Ann. Sec. 3-419(1)(c).[3] Maryland National Bank filed a cross-complaint against Signet. The plaintiffs voluntarily dismissed Legg Mason without prejudice on October 31, 1991. At the close of discovery, Prudential and the three banks moved for summary judgment. The district court granted the motions of all four movants and dismissed MNB's cross-complaint. Plaintiffs brought this appeal.
 
 II
 
 15
 The plaintiffs accuse Prudential of breaching its contractual and fiduciary duties to the Candlewood Trust under Maryland law for: (1) allowing Burkowske to request checks drawn on the Candlewood Trust account at Prudential without verifying the requests with the plan trustees, (2) failing to inspect canceled checks following payment by Bank of America, and (3) delivering to Burkowske checks payable to Candlewood Trust. The district court granted summary judgment in favor of Prudential, holding that Burkowske was an agent of the plan with actual authority to request and receive disbursements from the Candlewood Trust Account. It reasoned that Prudential, by innocently dealing with an authorized agent, could not have breached its fiduciary or contractual duties to the plan. We affirm, although on partially different reasoning.
 
 
 16
 Prudential argues that Burkowske, in his role as agent, had actual authority to request Prudential to draw checks on the Candlewood Trust account, even though many of those checks were in excess of the amounts approved by the plan trustees. To support this argument, Prudential relies on the role played by Burkowske in the administration of the plan. In response, the plaintiffs make unsupported assertions that Burkowske lacked any actual authority over the pension plan's funds.
 
 
 17
 Under Maryland law, " '[a]gency is the fiduciary relation which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other to so act.' " Proctor v. Holden, 540 A.2d 133, 142 (Md. Ct. Spec.App.) (quoting Restatement (Second) Agency Sec. 1 (1958)), cert. denied, sub nom. Holden v. Freeman & Kagan, 545 A.2d 1343 (Md.1988); see also Ivy H. Smith Co. v. Warffemius, 93 A.2d 764, 766 (Md.1953). Here, Burkowske was retained by the plan trustees to perform numerous services on behalf of the plan. It cannot be seriously contested but that in performing those services, he acted as an agent of Candlewood Trust. The principal issue, then, is the extent of his authority.
 
 
 18
 Whether an agent has authority to act on behalf of his principal is to be determined by the relationship between the parties as it exists under express agreement or as revealed by the actions of the parties. See Ramsburg v. Sykes, 158 A.2d 106, 108 (1960). Authority to do an act can be created by conduct of the principal that causes the agent to believe that the principal desires him to act on his behalf. Restatement (Second) of Agency Sec. 26 (1958). In this case, there was no written agreement granting Burkowske the authority to request checks. The undisputed facts of this case, however, demonstrate that the plan trustees' conduct impliedly gave Burkowske such authority.
 
 
 19
 The picture that emerges from the depositions of Fleischer and the physicians/trustees is one of busy medical practitioners attempting to provide retirement support for the employees of their professional corporation, but unable or unwilling to devote sufficient time to oversee the affairs of the pension plan they had established. They turned to a stock broker who was the brother of one of the trustees for investment advice. They asked Fleischer, the office manager of their professional corporation, to take time from her primary duties in order to attend to the administrative details of the pension trust fund, including the handling of loan requests from the trustees and other plan participants. Eventually, they delegated additional responsibilities to Burkowske. Nothing in these arrangements strikes us as inherently culpable, but the trustees' actions or inaction set the stage for a scenario that might have been prevented if the trustees had participated more actively in the management of the trust.
 
 
 20
 Burkowske was hired by the trust in 1986 under an oral agreement. A clear picture of the details of his envisioned duties does not emerge from the record. There is no question, however, that the trustees initially employed him to assist in the administration of the plan. It is also clear that Burkowske's role in administering the plan steadily increased. While there is nothing to indicate that Burkowske entered into his relationship with the trust fund with embezzlement in mind, he obviously could not resist the illicit opportunities that became available.
 
 
 21
 Stephen Mitchell testified that while he was at Prudential in 1986, requests for disbursement checks were made to him by either Fleischer or Burkowske. After Stephen Mitchell left and Richard Zink took over the Candlewood Trust account, Fleischer no longer made check requests because she was uncomfortable dealing with Zink. If a plan participant required a disbursement from the plan, Burkowske was the only person who requested payments from the Prudential account. The plaintiffs presented no evidence to show that anyone other than Burkowske dealt with Prudential with respect to disbursements during this period.
 
 
 22
 The trustees of the Candlewood Trust asserted below and argue here that they had no knowledge of Burkowske's role in the disbursement process. It is clear from Dianne Fleischer's deposition testimony, however, that she looked to Burkowske to contact Prudential for check requests. Given her responsibilities with respect to the plan,[4] there can be no doubt that Fleischer must be considered an agent of the trust and under Maryland law: "It is axiomatic that knowledge acquired by an agent in the course of [her] agency is imputed to [her] principal." Durst v. Durst, 169 A.2d 755, 757 (Md.1961). It is true that the four trustees, in their affidavits, denied that Fleischer was an agent of the trust. Such conclusory assertions, however, are insufficient to create a genuine issue of material fact. See Barwick v. Celotex Corp., 736 F.2d 946, 960 (4th Cir.1984) (" 'If a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact.' ") (quoting Perma Research & Dev. Co. v. Singer, 410 F.2d 572, 578 (2d Cir.1969)). Fleischer's knowledge of and reliance on Burkowske's role and the absence of any objection by the trustees is a strong indication that Burkowske had actual authority to request checks.
 
 
 23
 Significantly, Burkowske's role in handling the plan's finances was not limited to requesting checks from Prudential. On October 6, 1986, Candlewood P.C. wrote a check to RBA for $25,000, representing a contribution to the pension plan. Four more contribution checks were made payable to RBA and sent to Burkowske on June 15, 1987 ($10,000), June 30, 1987 ($34,000), August 8, 1987 ($100,000), and September 1, 1987 ($80,000). A member of Candlewood P.C. signed each of these checks, but none of them was able to explain in his deposition why over $200,000 in contributions to the plan were made via checks made payable to Burkowske's company.
 
 
 24
 Similarly significant is the manner in which individual trustees looked to Burkowske to handle financial matters for the trust. On September 1987, Dr. Foye, while attending a meeting of the trustees, wrote a check for $60,000, payable to Candlewood Trust, to repay money he had borrowed from the plan. Rather than give the check to one of the trustees, Foye handed it directly to Burkowske. Interestingly, that same month, both Drs. Foye and McGrade received $25,000 checks from Burkowske representing disbursements from the plan. Neither trustee questioned why their disbursement checks were drawn on RBA's Signet account instead of Candlewood Trust's account at Prudential. In June 1990 Dr. DiGrazia, another trustee, wrote a check for $24,763, payable to Candlewood Trust, to pay tax penalties. That check was not sent to the IRS or to Prudential; instead, DiGrazia mailed it to Burkowske who deposited it and retained the funds for his own use.
 
 
 25
 On November 12, 1987, Burkowske wrote to Fleischer in order to discuss loans to two plan participants. He stated,"I'm going to have Richard Zink send you a check which you in turn should send to me. I'm going to have him send a check for more than the one I'm sending you and I'll keep the balance in my escrow account in case we have any more loan requests in the future." There was no objection to Burkowske's plan to call Zink to request a check from the Candlewood Trust account. In fact, no objection was raised about the escrow account until the summer of 1990.
 
 
 26
 While we find that these undisputed facts support the district court's conclusion that Burkowske had actual authority to request disbursements from Prudential, we need not find that Burkowske had actual authority to request checks in amounts in excess of the requested loans. It is sufficient (and we think the undisputed facts demonstrate) that he had apparent authority to perform the acts which, as it later developed, were part of his embezzlement scheme. "Apparent authority results from certain acts or manifestations by the alleged principal to a third party leading the third party to believe that an agent had authority to act." Klein v. Weiss, 395 A.2d 126, 140 (Md.1978).
 
 
 27
 Under this principle, Prudential did not breach any duty to the plan by acting on Burkowske's requests. "The attitude of the principal himself must be such as to justify the belief, on the part of the person exercising reasonable prudence, that the agent is clothed with the requisite authority, before the principal can be held responsible for the agent's undertakings in excess of the powers actually delegated." Oxweld Acetylene v. Hughes, 95 A. 45, 46 (Md.1915). To reiterate, Burkowske provided the only mechanism by which the plan participants received disbursements from the plan once Zink took over the account. The plan's agent, Fleischer, received a letter notifying her of Burkowske's plan to request checks in excess of loan amounts, and there was no objection to this. Several of the trustees' contribution checks were sent to Burkowske, and those same trustees received disbursement checks drawn on Burkowske's business checking account. In sum, at no point while Candlewood Trust maintained an account with Prudential did the plan trustees express any displeasure with Burkowske's interaction with Prudential or invoke any limitations on what Burkowske could request on behalf of the plan. This "attitude of the principal[s]," id. and the other undisputed material facts in the record, were strong signals to Prudential that Burkowske had the apparent authority to request checks in the amounts stated.[5]
 
 III
 
 28
 The plaintiffs sued Signet, Bank of America, and MNB for conversion for their payment of checks written to Candlewood Trust but endorsed and deposited by Burkowske. Under Maryland law: "An instrument is converted when ... [i]t is paid on a forged indorsement." Md. Com. Law I Code Ann. Sec. 3-419(1)(c). A forged endorsement is one "made without actual, implied or apparent authority...." Md. Com. Law I Code Ann. Sec. 1-201(43) (1992). The trustees claim that Signet bank converted Candlewood Trust funds by allowing Burkowske to deposit checks payable to the plan in his RBA accounts and by crediting those accounts for the amounts of those checks. The plaintiffs also argue that Bank of America violatedSec. 3-419(1)(c) by paying on Prudential checks when they were presented by Signet, even though the checks had been made payable to Candlewood Trust but were endorsed by Burkowske. Similarly, plaintiffs claim that MNB violated Sec. 3-419(1)(c) when it paid Legg Mason checks that were presented by Signet for payment. All three banks respond that there were no violations of Sec. 3-419(1)(c) because Burkowske was authorized to endorse checks payable to the plan; therefore, the endorsements could not have been forged, as defined by Sec. 3-201(43).
 
 
 29
 All the defendant banks rely on the facts recited supra to demonstrate that Burkowske's intricate involvement in the handling of the Candlewood Trust's finances carried with it the authority to endorse checks payable to the plan. These facts demonstrate that the trustees, in entrusting Burkowske with managing many of the pension plan's financial affairs, impliedly gave him the authority to endorse checks made payable to the plan.
 
 
 30
 Under Maryland law, a person "who by his negligence substantially contributes ... to the making of an unauthorized signature is precluded from asserting ... the lack of authority against ... a drawee or other payor who pays the instrument in good faith and in accordance with the reasonable commercial standards of the drawee's or payor's business." Md. Com. Law I Code Ann. Sec. 3-406. In Taylor v. Equitable Trust Co., 304 A.2d 838 (Md.1973), the Court of Appeals of Maryland reversed a trial court's finding, after a bench trial, that the plaintiff's negligence was the proximate cause of an unauthorized transfer of $20,000, not the negligence of the defendant bank. The plaintiff had been defrauded in a Dominican Republic hotel scam. He sued his bank for transferring $20,000 to the operators of the scam on the basis of a letter which incorrectly stated that Taylor had authorized the bank to transfer the money to the scheme operators. Although the Maryland court reversed the judgment in favor of the Bank, in analyzing Taylor's claim, it stated: a depositor whose account has been charged with an item containing an unauthorized signature ... may be precluded by Sec. 3-406 from asserting the lack of authority against a drawee "who pays the instrument in good faith and in accordance with reasonable commercial standards" if the depositor's negligence has substantially contributed to the making of the unauthorized signature.
 
 
 31
 Id. at 843.
 
 
 32
 In Taylor, the Court of Appeals held thatSec. 3-406 was not a bar to recovery by the plaintiff because Equitable Trust had not conformed to reasonable commercial standards in transferring funds without making an inquiry into the authority of the author of the letter. Id. A bank officer admitted in deposition testimony that he had never heard of the author of the letter, and there was nothing before the court besides the bare assertion in the letter that the author was acting on behalf of Taylor. Under such circumstances, the court found that reasonable commercial standards required the bank to contact Taylor before transferring the $20,000. The court determined that it would not consider the effect of any negligence by Taylor, due to the bank's failure to engage in reasonable commercial behavior. Id.
 
 
 33
 The present case, in contrast, does not involve reliance by banks on a single letter from a stranger purporting to invoke the authority of the plaintiff/depositor. Here, there was a continuous and extensive relationship between Burkowske and Candlewood Trust. The undisputed facts demonstrate that Burkowske was an integral part of the financial affairs of the plan for over three years. During this period, the trustees issued plan contribution checks payable to Burkowske, relied on him to issue disbursement checks to plan members, and depended on him to handle loan repayments. The trustees never expressed any concern about the account at Signet or the procedures under which disbursement checks were issued by Burkowske. Given the trustees' conduct and the extent of Burkowske's authority, it was not commercially unreasonable for the banks to grant payment on checks endorsed by Burkowske, and the trustees are not in a position to argue that his signature was unauthorized.
 
 IV
 
 34
 The standard of review of a district court's grant of summary judgment is de novo, with the appellate court applying the same standards used by the district court. Felty v. Graves-Humphreys Co., 818 F.2d 1126, 1127-28 (4th Cir.1987). At the summary judgment stage, "the judge's function is not himself to weigh the evidence ... but to determine whether there is a genuine issue for trial.... [T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). The underlying facts and all inferences drawn therefrom must be viewed in the light most favorable to the non-moving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).
 
 
 35
 Applying those standards here draws us to the conclusion that the district court correctly granted summary judgment to Prudential and to the three defendant banks. The undisputed facts reveal that Burkowske, with the awareness of the trustees and their agent, was extensively involved in the financial affairs of the Candlewood Trust. Generally, of course, the "power [of] an agent to execute or indorse [checks] is to be strictly limited, and will never be lightly inferred, but ordinarily must be conferred expressly." Roland v. People's Bank of Somerset County, 106 A. 570, 572 (Md.1919) (quoting 2 Corpus Juris, 636). We also recognize that the "general rule is that the fact of an agency, and the extent of the agent's powers, when not created by a written instrument, are questions for the jury to determine under proper instructions." Forest Hill Permanent Bldg. Ass'n v. Fisher, 118 A. 164, 166 (Md.1922). That rule, however, is subject to a trial court's authority to make legal determinations under summary judgment standards. To be sure, there was no express grant of authority to Burkowske, empowering him to request, endorse, and deposit checks. The extent of Burkowske's responsibilities with respect to the plan and the trustees' failure to express any concern about his conduct, however, make clear that Burkowske had actual authority to conduct these transactions and had apparent authority to determine the amount requested. Aside from mere conclusory assertions that Burkowske lacked the authority to endorse checks, the plaintiffs have presented no evidence that brings into dispute a material fact.
 
 V
 
 36
 For these reasons, we affirm the district court's grant of summary judgment in favor of Prudential and the defendant banks.
 
 AFFIRMED
 
 
 [1]
 Checks issued by Prudential on behalf of the plan were drawn on a Prudential account at Bank of America
 
 
 [2]
 Checks issued by Legg Mason on behalf of the plan were drawn on a Legg Mason account at MNB
 
 
 [3]
 An instrument is converted when it is paid on a forged endorsement. Md. Com. Law I Code Ann. Sec. 3-419(1)(c) (1992)
 
 
 [4]
 Along with her other responsibilities, Fleischer served as a liaison between the trustees and plan participants with respect to loan requests; she worked with the plan's accountant on financial matters for the plan; and she received and reviewed the plan's account statements from Prudential
 
 
 [5]
 Appellants also contend that Prudential breached its fiduciary duty by failing to review Candlewood's canceled checks for improper endorsements and for delivering checks made payable to Candlewood Trust to Burkowske. In light of our finding that Burkowske had actual or apparent authority to request checks on behalf of the plan, delivery of such checks would not constitute a breach of Prudential's contract with or fiduciary duty to Candlewood Trust. There is no support for the plaintiffs' contention that a brokerage firms' failure to review canceled checks is a breach of its duties to its customers. See e.g., First Nat'l Bank v. Dean Witter & Co., 440 P.2d 391, 395 (Nev.1968)