826 A.2d 504

**Nkiambi Jean LEMA**

v.

**BANK OF AMERICA, N.A.**

No. 93, Sept. Term, 2002.

Court of Appeals of Maryland.

June 17, 2003.

626

Cynthia E. Young, Annapolis, Darren Margolis (Bierer & Margolis, P.A., Baltimore, on brief), for petitioner.

Dennis P. McGlone (Brian L. Moffet, Gordon, Feinblatt, Rothman, Hoffberger & Hollander, LLC, on brief), Baltimore, for respondent.

Argued before BELL, C.J., ELDRIDGE, RAKER, WILNER, CATHELL, HARRELL, BATTAGLIA, JJ.

BATTAGLIA, J.

We must determine in this case whether a deposit agreement between Petitioner Nkiambi Jean Lema, and his bank, Respondent, Bank of America, N.A. (hereinafter "Bank of America" or the "Bank"), altered the effect of the Maryland Uniform Commercial Code, presently codified at Maryland Code, §§ 1–101 to 10–112 of the Commercial Law Article (1975, 2002 Repl.Vol.) (hereinafter "UCC"), so that the Bank was entitled to debit Lema's account for losses that the Bank incurred because of an altered check deposited into Lema's account by a third party without Lema's authorization or signature. Under the circumstances of this case, and for the reasons discussed herein, we conclude that because provisions of the UCC permit parties by a deposit agreement to alter the effect of the UCC, the Bank was permitted to debit Lema's account as it did.

## I. Background

In 1999, Lema, an accountant, had two business checking accounts with Bank of America; one was held under the name of "N.J. Lema Co.", Lema's accounting business, and the other was held under the name of "Amas Trading Co.", another one of Lema's businesses. When Lema opened these accounts in 1999, he signed a signature card in which he agreed that the accounts "shall be governed by the terms and conditions set forth in . . . the Deposit Agreement." He also acknowledged that he received the Deposit Agreement. The Deposit Agreement provided, among other things, that:

> Unless prohibited by applicable law or regulation, we also reserve the right to charge back to your account the amount of any item deposited to your account or cashed for you which was initially paid by the payor bank and which is later returned to us due to an allegedly forged, unauthorized or missing endorsement, claim of alteration, encoding error or other problem which in our judgment justifies reversal of credit.

The Deposit Agreement also stated that:

> We may use funds in any account you maintain with Bank of America, N.A. to repay any debt which is due without notice to you (other than indebtedness incurred through the use of a credit card or if otherwise not permitted by law).

On November 24, 1999, Willy Amuli, a former accounting client and friend of Lema, deposited a check purportedly for $ 63,000 payable to N.J. Lema Co. into the N.J. Lema Co. account at a Virginia branch of Bank of America. The check was drawn by an Italian bank, Cassa di Risparmio di Padova e Rovigo, on its account at the Bank of New York. From December of 1999 to February 11, 2000, Lema withdrew the funds and gave them to Amuli in seven different transactions: four checks made payable to cash, the proceeds of which were given to Amuli, a wire transfer to Amuli in Nairobi, Kenya, a set of traveler's checks made payable to Amuli, and a transfer of $2,000 into Lema's "Amas Trading Co." account, which, he stated, was to satisfy a debt that Amuli owed him.

On January 12, 2000, Bank of New York forwarded to Bank of America a "Notice of Forgery Claim" informing Bank of America that the check Amuli deposited into Lema's account had been altered, since it was actually for $3,000, not $63,000. Bank of America returned $60,000.00 to Bank of New York by cashier's check dated February 16, 2000. Thereafter, in an "Advice of Debit" form dated February 22, 2000, Bank of America informed Lema that it was charging his account $60,000 as a result of the forgery claim it had received from the Bank of New York.[1]

On April 5, 2000, Lema filed a complaint for injunctive relief against Bank of America seeking the release of funds that the Bank had frozen in Lema's business checking accounts. On June 7, 2000, Bank of America filed an answer to Lema's complaint, included within which was a counter-claim seeking to recover for damages it incurred because of the altered check.[2] In its counter-claim, Bank of America alleged, among other things, that Lema violated various provisions of the UCC and also "breached the contract governing his deposit accounts" by "allowing raised and counterfeit checks to be passed through his accounts." On August 30, 2000, Lema filed an amended complaint for monetary damages in the amount of $60,000.00, $57,888.60 of which Bank of America had taken from his accounts.[3] Bank of America responded with an amended answer denying liability for Lema's money damages. A bench trial was held in the Circuit Court for Baltimore City on April 23 and 24, 2001.

---

1.  Amuli deposited another altered check for $19,000 into Lema's account in December of 1999. After learning of the second altered check, Bank of America charged back the proceeds to Lema's account, and unlike the $63,000 check at issue in this case, the Bank was able to recover the proceeds of the second altered check because Lema had not yet withdrawn them.

2.  Bank of America also filed a third party complaint against Willy Amuli. According to the Bank, Amuli evaded service and, therefore, was never made a party to the action.

3.  Bank of America sought to recover the full $60,000, but was able only to collect $57,888.60 from Lema's accounts with the Bank.

Lema testified that he had no knowledge of the altered check, that he did not authorize Amuli to deposit it into his account, and that he did not know it was made payable to N.J. Lema Co. According to Lema, he first noticed a substantial increase in the balance of his N.J. Lema Co. account in late November of 1999. Lema then learned from Amuli that his friend had deposited a check into Lema's account. Amuli told Lema that the check was to be used to support the children of a former president of Zaire who were living in the United States and explained that he deposited the check into Lema's account because Amuli did not have a bank account of his own.

After his discussion with Amuli, Lema spoke with a customer service representative from the Bank of America who explained that the proceeds from the check would not be available until it cleared, which would take about 17 days. Lema also requested a copy of the check. After the check cleared, but before receiving a copy of it, Lema withdrew the proceeds from the check in several different transactions and gave them to Amuli, except for the $2,000 that Amuli owed Lema. On February 23 or 24, 2000, after withdrawing all of the proceeds of the check and giving them to Amuli, Lema received Bank of America's "Advice of Debit" form informing him that the Bank was charging his account $60,000 because of Bank of New York's forgery claim. After that, Lema received a copy of the check and first realized that the check was made payable to N.J. Lema Co. Lema then sent an affidavit to Bank of America disclaiming any involvement in the alteration of the check. He also contacted the United States Secret Service and cooperated in its investigation regarding the check.

On April 26, 2001, the Circuit Court entered judgment in favor of Lema for $62,325.50 [4] and dismissed Bank of America's counter-claim.[5] In rendering its judgment, the trial

---

4. The judgment included interest.

5. The Circuit Court's written order contained a calculation error. On May 10, 2001, the order was reduced to reflect a judgment in favor of Lema for $62,037.74.

judge stated that the case was "controlled in the major part by the Uniform Commercial Code, which has now been adopted by the State of Maryland and is part of our Annotated Code dealing with negotiable instruments." Section 3–401 of the UCC, the Circuit Court opined, provides that a person is not liable on an instrument unless the person signed the instrument or authorized a representative to sign on the person's behalf. After finding that Lema had not signed the altered check, and that Amuli was not Lema's agent, the Court rejected Bank of America's argument that Lema was nonetheless liable on the check because he ratified it by his conduct and had breached certain warranties provided for in the UCC.

The Court also rejected Bank of America's claim that it had a separate contractual right to reimbursement from Lema pursuant to the Deposit Agreement. Specifically, the Court noted the Deposit Agreement, by its own terms, limited the Bank's rights against Lema if "contrary to law" and then found that it would be "contrary to law to enforce the contractual agreement between the parties in this case" because Section 3–401 of the UCC declares that a person cannot be liable on an instrument unless the person or the person's agent has signed the instrument.

Bank of America appealed, and the Court of Special Appeals reversed in an unreported opinion. The intermediate appellate court agreed with the Circuit Court's conclusion that Lema had not ratified the altered check or breached any warranties under the UCC. The Court of Special Appeals ultimately held, however, that the Deposit Agreement between Lema and Bank of America permitted the Bank "to debit Lema's accounts in the manner in which it did." In so holding, the court stated that under the circumstances of the case, Sections 1–102 and 4–103 of the UCC "clearly provide that the Deposit Agreement governs the relationship between the parties."

We granted Lema's writ of certiorari to consider the following question:

Does Bank of America's Deposit Agreement with its customers operate as an agreement to eliminate the protections afforded bank customers under Title 3 of the Uniform Commercial Code?

For the reasons discussed herein, we conclude that under the circumstances of this case, the Deposit Agreement between Lema and Bank of America altered the effect of Section 4–214 of the UCC. Consequently, the Deposit Agreement entitled Bank of America to debit Lema's accounts for $60,000, the difference between the true amount of the check deposited by Amuli and its altered amount, and it also entitled Bank of America to interest, certain expenses, and attorneys' fees and costs, as provided for in the Deposit Agreement.[6]

## II. Discussion

Lema contends that the Court of Special Appeals erred in reversing the judgment of the Circuit Court because "the plain language of the [Deposit Agreement] imposes no liability on Lema for the altered check." In support of his contention, Lema asserts that the Deposit Agreement gives the Bank rights of charge-back and setoff only if those rights are not "prohibited by applicable law." The applicable law, found in Titles 3 and 4 of the UCC, however, prohibits the actions of the Bank, according to Lema. Specifically, Lema claims that Title 3 of the UCC, "prohibits the bank from reversing the credit because Lema did not indorse the instrument, did not alter it, did not transfer it, and did not ratify it." Title 4 of the UCC also precludes the Bank's actions, according to Lema, because it "prohibits a bank from charging back a

---

6. The Deposit Agreement provides:

Unless prohibited by law, you agree to reimburse us for any losses, liabilities and expenses (including attorneys' fees or collection agencies' fees) we may incur with respect to overdrafts or otherwise in connection with your account, except to the extent they are caused by our fault.

＊　　＊　　＊

You agree to pay our attorneys' fees and costs, in addition to any obligations described above, in the event that we shall prevail in any legal proceeding arising out of your account or this agreement.

customer's account" once a "settlement" becomes "final." In addition, Lema claims that the provisions of the Deposit Agreement are ambiguous as to whether they were intended to alter the effects of the UCC, and that the Circuit Court was not "clearly erroneous" in determining that the UCC was controlling. Further, even if the provisions of the Deposit Agreement entitled the Bank to debit Lema's accounts, he asserts that they are void because they impose no duty of good faith and ordinary care on the Bank, which the UCC requires. Finally, Lema claims that the Bank never raised the issue of whether the Deposit Agreement altered the effect of the UCC to the Circuit Court or the Court of Special Appeals. Consequently, Lema contends that the Court of Special Appeals raised the issue *sua sponte* and abused its discretion by doing so.

Bank of America counters that the Deposit Agreement is enforceable under the UCC and that the Agreement clearly authorized the Bank to "charge-back and set off . . . the raised amount of the altered check." The Bank also asserts that it "acted in good faith and observed its duty of ordinary care," and that, contrary to Lema's contention, it did in fact raise its contractual claims in the Circuit Court and before the Court of Special Appeals.

It is undisputed that the UCC applies to commercial transactions in Maryland, including the commercial dealings between a bank and its customer. In *Wright v. Commercial & Sav. Bank*, 297 Md. 148, 153, 464 A.2d 1080, 1083 (1983), we stated:

> Title 3 of the [UCC] governs transactions with negotiable instruments . . .; however, that provision of the Code does not address the relationship between a bank and its depositor except as those parties might deal with a specific check. Title 4 of the [UCC,] [however,] covers "Bank Deposits and Collections . . . ."

Because this case involves a specific negotiable instrument, the altered check, as well as bank deposits and collections, both Title 3 and Title 4 apply.

Section 3–401(a) of the UCC requires that a person or the person's agent must sign an instrument in order to have liability on the instrument. That Section provides:

> A person is not liable on an instrument unless (i) the person signed the instrument, or (ii) the person is represented by an agent or representative who signed the instrument and the signature is binding on the represented person under § 3–402.

Section 4–214(a) gives a bank the right under certain conditions to revoke a "settlement"[7] given to a customer with respect to an "item,"[8] to charge-back to a customer's account the amount of any credit given for an item, and the right to obtain a refund from its customer. These rights terminate under the UCC, however, once settlement for an item received by the bank becomes final. Section 4–214(a) states:

> If a collecting bank has made provisional settlement with its customer for an item and fails by reason of dishonor, suspension of payments by a bank, or otherwise to receive settlement for the item which is or becomes final, the bank may revoke the settlement given by it, charge-back the amount of any credit given for the item to its customer's account, or obtain refund from its customer, whether or not it is able to return the item, if by its midnight deadline or within a longer reasonable time after it learns the facts it returns the item or sends notification of the facts. If the return or notice is delayed beyond the bank's midnight deadline or a longer reasonable time after it learns the facts, the bank may revoke the settlement, charge-back the credit, or obtain a refund from its customer, but it is liable for any loss resulting from the delay. These rights to

---

7. To "settle," according to Section 4–104(11) of the UCC, "means to pay in cash, by clearing-house settlement, in a charge or credit or by remittance, or otherwise as agreed. A settlement may be either provisional or final...."

8. "Item" is defined by in Section 4–104(9) of the UCC as "an instrument or a promise or order to pay money handled by a bank for collection or payment. The term does not include a payment or order governed by Title 4A or a credit or debit card slip...."

revoke, charge-back, and obtain a refund terminate if and when a settlement for the item received by the bank is or becomes final.

Thus, the provisions of the UCC state that a person is not liable on an instrument unless the person or the person's agent signs the instrument and that a bank's right to revoke settlement, charge-back to a customer's account, and obtain a refund from a customer, terminates when the settlement for an item received by a bank becomes final.

These provisions, however, are not necessarily binding. As observed by Professors White and Summers, "The parties may vary their effect or displace them altogether: freedom of contract is the rule rather than the exception. Most commercial law is therefore not in the Code at all but in private agreements...." JAMES J. WHITE & ROBERT S. SUMMERS, UNIFORM COMMERCIAL CODE, § 3 (5th ed.2000) (footnote omitted). Indeed, the UCC expressly provides that the effect of its provisions may be altered by agreement. Section 1–102(3) declares:

> The effect of provisions of Titles 1 through 10 of this article may be varied by agreement, except as otherwise provided in Titles 1 through 10 of this article and except that the obligations of good faith, diligence, reasonableness and care prescribed by Titles 1 through 10 of this article may not be disclaimed by agreement but the parties may by agreement determine the standards by which the performance of such obligations is to be measured if such standards are not manifestly unreasonable.

Similarly, according to Section 4–103(a):

> The effect of the provisions of this title may be varied by agreement, but the parties to the agreement cannot disclaim a bank's responsibility for its lack of good faith or failure to exercise ordinary care or limit the measure of damages for the lack or failure. However, the parties may determine by agreement the standards by which the bank's responsibility is to be measured if those standards are not manifestly unreasonable.

We have recognized the ability of parties by contract to alter the effect of provisions of the UCC in *Etelson v. Suburban Trust Co.*, 263 Md. 376, 379, 283 A.2d 408, 410 (1971). In that case, Mr. Etelson, as president of a corporation that received a loan from Suburban Trust Company, executed a promissory note payable to the order of Suburban. *Id.* at 377, 283 A.2d at 409. As security for the loan, Suburban required an interest in a truck owned by the corporation and that Mr. Etelson and his wife guarantee payment of the note. The Etelsons indorsed the back of the note, which stated in part that they consented to "the release or exchange of any collateral without notice." *Id.* at 378, 283 A.2d at 410. After the corporation filed for bankruptcy and defaulted on the note, Suburban attempted to assert its priority security interest in the truck but was unsuccessful because it had failed to file a financing statement on time. *Id.* at 377, 283 A.2d at 409. Unable to recover the truck, Suburban brought an action against the Etelsons as endorsers on the promissory note. The Etelsons, relying on the UCC[9], asserted that Suburban could not recover from them because the bank had negligently impaired its security by failing to timely file the financing statement. *Id.* at 377–78, 283 A.2d at 409.

We agreed with the Circuit Court's conclusion that the bank "owed no duty to the Etelsons to record the financing statement." *Id.* at 380, 283 A.2d at 411. "The UCC," we explained, "recognizes that there may be times where parties to an instrument may choose to alter the general provisions of the UCC to meet their particular purposes." *Id.* at 379, 283 A.2d at 410 (citing Section 1–102(3)). Thus, we concluded that "by agreeing to the broad language of the endorsement", the Etelsons "limited the protection to which they might have otherwise been entitled under the UCC." *Id.; see also Taylor v. Equitable Trust Co.*, 269 Md. 149, 157, 304 A.2d 838, 843 (1973)(recognizing that under Section 4–103(1), "UCC provisions may be varied by agreement so long as 'a bank's

---

9. The Etelsons specifically relied on former Sections 3–606(1)(b), 9–207(1), and 9–302(1) of the UCC.

responsibility for its own lack of good faith or failure to exercise ordinary care' is not disclaimed").

Other jurisdictions also have recognized that parties may vary by agreement the effect of the terms of the UCC. *See, e.g., Western Air & Refrigeration, Inc. v. Metro Bank of Dallas,* 599 F.2d 83, 89–90 (5th Cir.1979) (concluding that an agreement to vary the "midnight deadline" requirements of Section 4–302 is valid and enforceable); *Zambia Nat'l Commercial Bank Ltd. v. Fidelity Int'l Bank,* 855 F.Supp. 1377, 1392 (S.D.N.Y.1994)(stating that, "the bank and depositor may agree to include conditions precedent or vary the statute of limitations under the U.C.C. consistent with the principle that such agreements may not be manifestly unreasonable"); *Scott Stainless Steel, Inc. v. NBD Chicago Bank,* 253 Ill.App.3d 256, 192 Ill.Dec. 333, 625 N.E.2d 293, 297 (1993) (stating that Section 4–103(1) "authorizes a bank to enter into an agreement with its customers that modifies the provisions of Article 4 of the Code" and upholding indemnification agreement between bank and customer that did not exculpate bank from duties of good faith and ordinary care); *First United Bank v. Philmont Corp.,* 533 So.2d 449, 454 (Miss.1988)(stating "[t]hat a transaction falls within Article 4 . . . . does not necessarily lead to a mechanical application of Code law" for "[t]he UCC empowers parties to commercial transactions to vary by agreement the Code provisions in many significant ways" and determining that the authority controlling the rights and liabilities of the parties included a "Merchant Agreement" and clearinghouse rules); *Triffin v. First Union Bank,* 319 N.J.Super. 72, 724 A.2d 872, 874–75 (1999) (recognizing that under Section 1–102(3) of New York's UCC, the effect of the provisions of the UCC, "may be varied by agreement," and upholding agreement that shifted risk of loss from bank to customer, unless loss resulted from bank's gross negligence or willful misconduct); *National Title Ins. Corp. Agency v. First Union Nat'l Bank,* 263 Va. 355, 559 S.E.2d 668, 671 (2002)(concluding that bank may, through a contractual agreement with its customer, shorten a one-year statute of limitations period provided for in the Virginia UCC to 60 days).

■ The official comments to Sections 1–102 and 4–301 reinforce the concept that the UCC's effect may be altered by agreement, and as we recently recognized in *Messing v. Bank of America,* 373 Md. 672, 684–85, 821 A.2d 22, 29 (2003) (quoting *Jefferson v. Jones,* 286 Md. 544, 547–48, 408 A.2d 1036, 1039 (1979)), the official comments are "a useful aid for determining the purpose" of UCC provisions. Official comment 2 to Section 1–102 states that, "freedom of contract is a principle of the Code," and " 'the effect' of its provisions may be varied by 'agreement.' " Similarly, Official Comment 1 to Section 4–103 states that the Section "permits within wide limits variation of the effect of provisions of [Title 4] by agreement."

The official comments also discuss the types of agreements that may vary the effect of the UCC's terms. Official comment 2 to Section 4–103 provides that the term "agreement," as used in that Section, has the same meaning as given to it by Section 1–102(3), and specifically states that an agreement may be with respect to "all items handled for a particular customer, e.g, a general agreement between the depositary bank and the customer at the time a deposit account is opened." That, of course, is the type of agreement in issue in the present case.

■ The relationship between a bank and its customer is contractual. *University Nat. Bank v. Wolfe,* 279 Md. 512, 514, 369 A.2d 570, 571 (1977)("The relationship, which has been universally recognized and consistently followed in this State to the present time, is that of debtor and creditor, with the rights between the parties considered as contractual, and derived by implication from the banking relationship unless modified by the parties") (citations omitted); *Taylor,* 269 Md. at 155, 304 A.2d at 842 (stating that "the rights of the depositor and the liability of the bank [are] contractual"). In the present case, there is no dispute that Lema signed two signature cards for his accounts at Bank of America. Those cards stated, in part, that Lema "acknowledges and agrees" that his accounts "shall be governed by the terms and conditions set forth in the following documents, as amended from

time to time: (1) the Deposit Agreement...." Thus, the signature cards, along with the Deposit Agreement, constitute the contract between Lema and Bank of America. *See Kiley v. First Nat'l Bank of Maryland,* 102 Md.App. 317, 326–27, 649 A.2d 1145, 1149 (1994)(recognizing that a signature card constitutes a contract between a bank and its customer and finding that the bank customer accepted bank rules and regulations when the signature card specifically referred to those rules and regulations), *cert. denied,* 338 Md. 116, 656 A.2d 772, *cert. denied,* 516 U.S. 866, 116 S.Ct. 181, 133 L.Ed.2d 120 (1995).

■ Lema contends that the Deposit Agreement did not entitle the Bank to debit Lema's account because the Agreement provides the Bank with that right only if not "prohibited by applicable law." According to Lema, Title 3 is the applicable law, and Section 3–401(a) of that Title "provides that a person is not liable on an instrument unless the person or an authorized representative signed it." As we have seen, however, Title 3 is not the *only* applicable law; Title 4 deals with "Bank Deposits and Collections" and also is applicable in this case.

■ Section 4–214 allows a collecting bank to charge back and obtain a refund from a customer's account if the bank does not receive final settlement for an item. Neither that section, nor any other section of Title 4 indicates that the bank's rights to charge back and reimbursement are dependent upon whether the customer indorsed a deposited item.

Indeed, former Section 4–205(1) expressly allowed a bank to accept an unindorsed item for collection and to "supply any indorsement of the customer." *See* Maryland Code, § 4–205 of the Commercial Law Article (1975, 1992 Repl.Vol.). Revised Section 4–205 does not eliminate a bank's ability to supply an indorsement. The revised Section states in part: "The depositary bank becomes a holder of the item at the time it receives the item for collection if the customer at the time of delivery was a holder of the item, whether or not the customer indorses the item...." The purpose of the amendment, as

indicated in the official comment, was to clarify that a bank is a holder whether or not it supplies the missing indorsement of its customer. The comment states:

> It is common practice for depositary banks to receive unindorsed checks under so-called "lock box" agreements from customers who receive a high volume of checks. No function would be served by requiring a depositary bank to run these items through a machine that would supply the customer's indorsement except to afford the drawer and the subsequent banks evidence that the proceeds of the item reached the customer's account.

◼ In addition, in other contexts, Title 4 allows for customer liability for the amount of an item, even though the customer has not signed the item. For example, Section 4–401(a)–(b) allows for customer liability for the amount of an overdraft even if the customer did not sign the item, as long as the customer benefitted from its proceeds. Section 4–401(b) states: "A customer is not liable for the amount of an overdraft if the customer neither signed the item nor benefitted from the proceeds of the item." Thus, Lema's contention that the Bank was "prohibited by applicable law" from debiting his account because he did not sign the altered check is without merit.

◼ Although Section 4–214 does not require that a customer sign an item in order for a bank to exercise its rights of charge back and reimbursement, those rights are not without limits. Section 4–214(a) does state that the "rights to revoke, charge-back, and obtain refund terminate if and when a settlement for the item received by the bank is or becomes final." [10] As previously discussed, however, the effect of the

---

10. We note that Section 4–214 also provides that a bank must "return[ ] the item or send[ ] notification of the facts" by its "midnight deadline or within a longer reasonable time after it learns of the facts." Although a bank's failure to comply with this requirement does not terminate its rights to revoke a settlement, charge back, and obtain a refund from a customer, the bank will be "liable for any loss resulting from the delay." Lema has not argued that Bank of America failed to comply with the duty.

provisions of Title 4 are subject to alteration by agreement. Acknowledging this, Lema, nonetheless, contends that the provisions of the Deposit Agreement are ambiguous as to whether they were intended to modify the UCC, and that the Court of Special Appeals erred in holding that they did because the Circuit Court's determination on the issue was not "clearly erroneous." Contract ambiguity, however, is not a factual issue and is not, therefore, subject to the "clearly erroneous" standard of review. "[T]he determination of ambiguity is one of law, not fact, and that determination is subject to *de novo* review by the appellate court." *Calomiris v. Woods,* 353 Md. 425, 434, 727 A.2d 358, 362 (1999). Viewing the provisions of the Deposit Agreement under that standard, we conclude that they are not ambiguous, as asserted by Lema. The Deposit Agreement clearly states that unless prohibited by applicable law, the Bank has the right "to charge back to [Lema's] account the amount of any item deposited to [his] account or cashed for [him] which was initially paid by the payor bank and which is later returned to us due to ... a **claim of alteration** ... which in our judgment justifies reversal of credit [emphasis added]." The Agreement also declares that the Bank "may use funds in any account" that Lema maintains with the Bank "to repay any debt which is due without notice to [Lema] (other than indebtedness incurred through the use of a credit card or if otherwise not permitted by law)."

The Agreement also does not terminate the Bank's rights of charge back and reimbursement, as does the UCC, once settlement becomes final and so alters the effect of Section 4–214, as permitted in the UCC. It is for this reason that Lema's reliance on *Boggs v. Citizens Bank and Trust Co. of Maryland,* 32 Md.App. 500, 363 A.2d 247 (1976), with respect to Section 4–214, is misplaced. There, the Court of Special Appeals held that because settlement of an item had become final, a bank was not permitted under Section 4–212, the predecessor of Section 4–214, to charge back a customer's account. *Id.* at 505, 363 A.2d at 250. *Boggs,* however, did not involve any agreements altering the effect of the UCC.

Moreover, the Deposit Agreement is in accord with the UCC's policy of shielding transferees of items from the risk of loss created by, for instance, an unauthorized alteration. Section 4–207(a)(3) of the UCC, for example, provides that, when a bank customer transfers an item and receives consideration, the customer warrants to the transferee that, among other things, "[t]he item has not been altered." Although Lema did not himself transfer the altered check to the Bank, the Deposit Agreement follows the general policy of this Section by providing protection for a transferee, in this case the Bank, that receives an altered item.

The power to alter the effect of UCC provisions, however, is not unlimited. The text and comments of the UCC emphasize that agreements cannot disclaim a bank's obligations of good faith and ordinary care. *See also Taylor*, 269 Md. at 157, 304 A.2d at 843 (recognizing that under Section 4–103, agreements may not disclaim "a bank's responsibility for its own lack of good faith or failure to exercise ordinary care"); *Bank of S. Maryland v. Robertsons' Crab House, Inc.*, 39 Md.App. 707, 714 n. 5, 389 A.2d 388, 393 n. 5 (1978)(noting that Sections 1–102 and 4–103 "prevent a bank from contracting away its obligation to use ordinary care in the handling of depositors' funds"). Also, as indicated in official comment 2 of Section 1–102, although "an agreement can change the legal consequences which would otherwise flow from the provisions of the Act," an agreement cannot alter "[t]he meaning of the statute itself." Such meaning "must be found in [the UCC's] text, including its definitions, and in appropriate extrinsic aids." In explanation of this distinction, comment 2 to Section 1–102 provides the following examples. Agreements may not make an "instrument negotiable within the meaning of Title 3 except as provided in Section 3–401." Agreements also may not "change the meaning" of various UCC terms, such as "bona fide purchaser," "holder in due course," or "due negotiation."

The Deposit Agreement in the present case does not vary the "meaning of the statute itself." Rather, it changes "the legal consequences which would otherwise flow from the provisions of the Act." Under Section 4–214(a) of the UCC, the

"legal consequence" of final settlement is that a bank loses its right to charge-back and obtain a refund from a customer. The Deposit Agreement has no such restriction. Thus, the Agreement alters the legal effect of the UCC, not its "meaning".

Further, we disagree with Lema's contention that the provisions of the Deposit Agreement disclaim the Bank's obligations of good faith and ordinary care. In support of that contention, Lema relies on the decision in *Cumis Ins. Soc'y v. Girard Bank*, 522 F.Supp. 414 (E.D.Pa.1981). There, an agreement between a bank and its customer authorized the bank to honor checks when "bearing or purporting to bear the facsimile signature or any signature" of two authorized representatives of the bank's customer "with the same effect as if the signature or signatures were manual signatures." *Id.* at 416. The agreement also stated that the customer "agrees to indemnify and hold harmless the Bank ... from any damages the bank may suffer ... by reason of its acting upon" the agreement. *Id.* at 417. After the bank paid checks that bore unauthorized facsimile signatures and debited its customer's account, the customer's insurance company brought an action to recover the funds. *Id.* In a motion for summary judgment, the bank argued that the insurer was "precluded from denying the validity of the unauthorized signature" because the agreement between the bank and the customer "shift[ed] the risk of loss for unauthorized signatures to the customer." *Id.* at 420. The United States District Court rejected the bank's argument because it found that the agreement was ambiguous and that if it were construed as the bank asserted, it would "have the effect of exculpating the bank from any liability regardless of its own negligence in paying the instruments bearing forged drawer signatures."[11] *Id.* at 422.

---

11. The *Cumis* court also stated that it had "doubt as to the validity of any agreement ... which seeks to abrogate the fundamental rules of liability for forged signatures which are embodied in the Code," and that "[u]nder the Code, the interest in finality of commercial transactions dictates that the risk of loss in forged check cases be placed on the drawee." *Id.* at 423. The "doubt" of the *Cumis* court as to the validity

Unlike the agreement in *Cumis*, the Deposit Agreement in the present case, as previously discussed, is not ambiguous. Additionally, the Deposit Agreement's plain language does not exculpate the Bank from its own lack of good faith or ordinary care, and the Bank has not advocated such an interpretation. The Bank's rights to "charge-back" and "use the funds" in any of Lema's accounts under the Agreement exist only if not "prohibited by applicable law." The applicable law, Sections 1–102(3) and 4–103(a), prohibits parties from disclaiming the requirements of good faith and ordinary care. Thus, in contrast to the exculpatory clause in *Cumis*, the Deposit Agreement in the instant case recognizes the Bank's obligations of good faith and ordinary care by limiting its contractual rights so that they are in accordance with applicable law.

Lema also claims that other provisions of the Agreement giving rights to the Bank, which neither state "unless prohibited by applicable law" nor contain a similar disclaimer, are void because they impose no duty of good faith and ordinary care on the Bank. Specifically, Lema takes issue with the following provision:

> If a deposited item is returned to us by the bank on which it is drawn, we may accept that return and charge the item back against your account without regard to whether the other bank returned the item before its midnight deadline.

---

of the agreement in that case arose from its interpretation of UCC provisions dealing with forged signature liability, which the court viewed as creating "expressions of policy" that were "specific" to the issue of forged signature liability. *Id.* In particular, the court noted that under Section 4–401(a) of the Pennsylvania Commercial Code, a bank may charge against a customer's account only items that are "properly payable" and that pursuant to Section 3–404, an instrument containing a forged or unauthorized signature is not "properly payable." *Id.* at 418. The *Cumis* court opined that these provisions created "strict liability," and that the risk of loss for a forged or unauthorized signature must be assumed by the bank. *Id.* at 423. Lema has not argued forged signature liability in the present case. Thus, Maryland statutory provisions equivalent to those Pennsylvania provisions referred to by the *Cumis* court are not implicated, and the statements of the *Cumis* court with respect to forged signature liability under the UCC are inapposite.

Lema also finds fault with the Deposit Agreement's statement that:

Credit for items deposited is provisional and subject to revocation if the item is not paid for any reason.

Lema claims the following provision is also void:

[I]f payment is not received for any deposited item, the amount of the item will be charged back to your account and may create an overdraft, for which we will charge you a fee. You agree to pay the amount of any overdraft together with any overdraft fees immediately upon demand.[12]

As Lema himself points out, however, parties are presumed to know the law when entering into contracts, and thus, "all applicable or relevant laws must be read into the agreement of the parties just as if expressly provided by them, except where a contrary intention is evident." *Wright,* 297 Md. at 153, 464 A.2d at 1083. Nothing in the language of the provisions of the Deposit Agreement referred to by Lema explicitly exculpates the Bank from its duties of good faith and ordinary care. Those requirements, therefore, must be "read into the agreement." Moreover, even if the provisions referred to by Lema were to be considered void, the Bank's right to recover from Lema for losses it suffered because of the altered check would remain intact, for the Deposit Agreement contains a severability clause: "A determination that any part of this agreement is invalid or unenforceable will not effect the remainder of this agreement."

In addition, the Circuit Court made no finding that Bank of America acted in bad faith or without ordinary care. Although the Circuit Court concluded that the Bank's policy of accepting unindorsed checks for deposit was "contrary to the law of liability as to required signatures," it did not make any findings regarding bad faith or ordinary care. Moreover, the court was incorrect in concluding that the Bank's policy of accepting unindorsed checks is contrary to law. As discussed

---

12. The Bank charged Lema $230.39 for overdraft fees in connection with the altered check.

above, Title 4 of the UCC specifically allows a bank to supply an indorsement on an item deposited by its customer and imposes liability on a customer for the amount of an overdraft even if the customer did not sign the item, as long as he or she benefitted from its proceeds.

Finally, we are unpersuaded by Lema's argument that the Bank failed to raise its contractual claims in the Circuit Court or the Court of Special Appeals, and that the Court of Special Appeals violated Maryland Rule 8–131[13] by raising the issue *sua sponte*. In Count II of its four-count counterclaim, the Bank advocated a "Breach of Contract" theory of recovery, arguing that, "in allowing raised and counterfeit checks to be passed through his accounts," Lema had "breached the contract governing his deposit accounts" and that as a result, the Bank was "injured . . . in the amount of at least $60,000, plus interest, costs, and attorney fees." In addition, during trial, counsel for the Bank presented the Deposit Agreement, including the provision addressing the Bank's right to setoff, which was entered into evidence by the Circuit Court, and had Lema read the provisions of the Agreement addressing the Bank's right to setoff. Indeed, during closing argument, counsel for Lema acknowledged the Bank's contractual theory of recovery by stating, "Depositary Agreement is another theory by which the Bank of America is attempting to proceed against Mr. Lema," and argued:

> So the Bank of America can't say on the one hand the commercial law article might apply, there might not be a signature, it might not have been ratified, but we are entitled to get the money back anyway because we had this deposit contract. Doesn't work that way. That contract can't overwrite the laws of Maryland. It can't seek to collect something when there is no legal right to do so.

---

13. Maryland Rule 8–131(a) states in part:

   Ordinarily, the appellate court will not decide any other issue unless it plainly appears by the record to have been raised in and decided by the trial court, but the Court may decide an issue if necessary or desirable to guide the trial court or to avoid the expense and delay of another appeal.

In addition to arguments by counsel, the Circuit Court specifically ruled on the Bank's contractual theory. It declared in its oral ruling from the bench:

> As a fallback final position, the bank falls back on the deposit agreement in its contractual relationship with Mr. Lema. That is in evidence in this case. It says, in essence, that the bank may use funds in any account which the plaintiff may maintain with the bank to repay debt which is due without notice to the customer.... It goes on to say in its own language, unless contrary to law.... Court finds in this case that the law as cited in Uniform Commercial Code subsection 3–401 indicates that a person is not liable on the issue unless the person signed the instrument or the person is represented by an authorized agent. Therefore, it would be contrary to law to enforce the contractual agreement between the parties in this case....

Further, in its motion for reconsideration, which was denied by the Circuit Court, the Bank argued that it "had both a statutory and contractual right to charge the altered check back against [Lema's] accounts." In support of that argument, the Bank quoted the provision of the Deposit Agreement that gave it the right to charge back Lema's account "the amount of any item deposited to [Lema's] account or cashed for [Lema] which was initially paid by the payor bank and which is later returned to [Bank of America] due to ... [a] claim of alteration...." *See Walls v. Bank of Glen Burnie*, 135 Md.App. 229, 240, 762 A.2d 151, 157 (2000)(concluding that "relation back" issue was preserved for appellate review when it was "raised in the circuit court" in a "motion to alter or amend"). Finally, in its brief submitted to the Court of Special Appeals, the Bank argued that Lema was "also liable under the Deposit Agreement between [Lema] and Bank of America for any loss suffered by Bank of America due to ... any claim of alteration" and referred to the provision of the Deposit Agreement that provided the Bank with a right to charge back the amount of any item deposited to a customer's account if initially paid but later returned because of a claim of alteration.

Thus, we conclude Bank of America was entitled to debit Lema's accounts as it did.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED; COSTS TO BE PAID BY PETITIONER.**

BELL, C.J., ELDRIDGE and HARRELL, JJ., dissent.

Dissenting Opinion by HARRELL, J., in which BELL, C.J. and ELDRIDGE, J., Join.

The majority opinion in this case puts new oil on the old saw that hard cases make bad law.[1] This case addresses the interpretation of the Deposit Agreement between Lema and Bank of America (the Bank), and Maryland Code (1974, 2002 Repl.Vol.), Commercial Law Article, §§ 1–101 to 10–112[2] (hereinafter "UCC" or "Code"), specifically Title 3 (Negotiable Instruments) and Title 4 (Banking). Interpretations of these UCC provisions impact the very foundations of the economy of Maryland. Because the Majority, in my opinion, distorts the Code and Maryland contract law to achieve perhaps what may appear to the Majority to be a just result based on the aroma of possible inferences emanating from the facts of this case, rather than deciding the case in accordance with the clear dictates of the principles of the UCC, I respectfully dissent.

## I.

The facts of this case raise obvious questions in addition to those properly before the Court. Though the case should not turn on these questions, it is important for a complete understanding of the posture of the case that we at least acknowledge their presence as "elephants in the living room." The first and most obvious question is whether Lema's conduct in

---

1. I most recently had recourse to this maxim in *In Re Adoption / Guardianship Nos. J9610436 and J9711031*, 368 Md. 666, 704 n. 1, 796 A.2d 778, 800 n. 1 (2002) (Harrell, J., dissenting).

2. Unless otherwise provided, all statutory references are to Maryland Code (1974, 2002 Repl.Vol.), Commercial Law Article, §§ 1–101 to 10–112.

drawing down on the proceeds of the pertinent check was merely naive or rather reflected a sinister plot; a question, as noted, not properly before us. In addition to the unanswered question of Lema's state of mind, there exists the unaddressed question of who, under the UCC, if not Lema,[3] might ultimately and properly be liable on the altered check as a negotiable instrument. As I see it, the issue of whether Lema is liable on the instrument under the UCC is an issue separate and distinct from the question of Lema's potential liability arising under the Deposit Agreement with the Bank. The trial court was correct in concluding that Lema is not liable on the check. Checks are negotiable instruments and are governed by Title 3 of the UCC. *See Messing v. Bank of America,* 373 Md. 672, 821 A.2d 22 (2003). Section 3–401(a) states:

(a) A person is not liable on an instrument unless (i) the person signed the instrument, or (ii) the person is represented by an agent or representative who signed the instrument and the signature is binding on the represented person under § 3–402.

This is the UCC default provision for all circumstances not otherwise provided for by other sections of the UCC. Its existence is necessary to insure the degree of certainty of liability and extent of risk required for those engaged in commercial / financial transactions. The record shows that neither Lema, nor anyone else, endorsed the pertinent check in this case.

While it does not appear essential to the Majority decision in this case, the Majority, at the invitation of Bank of America, asserts the proposition that the UCC, as a matter of policy, allows for the transfer of rights, duties, liabilities, and warranties without signature. The Majority opinion suggests (slip op. at 638–40; 646) that because it can identify two sections of Title 4, § 4–205 and § 4–401, where liability is imposed or rights transferred in the absence of a signature, that the UCC contemplates, as a matter of implied policy, such transfers in

---

3. As the Majority notes, Mr. Amuli is no where to be found.

circumstances apparently not provided for by the UCC. Nothing could be further from the truth. The UCC is quite explicit as to how seemingly unprovided-for-situations are to be handled.

As was pointed out, *supra*, under § 3–401(a) an individual is not liable on an instrument unless signed by that individual or an agent of that individual. Also as noted, *supra*, this is the default provision of the Code pertaining to negotiable instruments. We know this because of § 3–102(b), which provides that "[i]f **there is a conflict** between this title and Title 4 or 9, Titles 4 and 9 govern," and § 4–102(a), which states that "[t]o the extent that items within this title are also within Titles 3 and 8, **they are subject to those titles. If there is a conflict,** this title governs Title 3, but Title 8 governs this title." (Emphases added). Both §§ 3–201(b) and 4–102(a) require a direct conflict between **applicable** sections of Title 3 and Title 4 in order to override the requirement of a signature on the instrument as provided in § 3–401(a). As will be shown, *infra*, neither of the statutory provisions pointed to by the Majority, § 4–205(1) and § 4–401, are applicable to the facts of this case, and thus no conflict between the provisions of Title 3 and Title 4 exists. Because no conflict between the Titles exists, § 3–401(a), requiring a signature, controls.

Contrary to the apparent suggestion of the Majority opinion (slip. op. at 638–40, 646), Lema is not liable on the check under § 4–205. Section 4–205 states:

> **If a customer delivers** an item to a depositary bank for collection:

> (1) The depositary bank becomes a holder of the item at the time it receives the item for collection **if the customer at the time of delivery was a holder of the item,** whether or not the customer indorses the item, and, if the bank satisfies the other requirements of § 3–302, it is a holder in due course; and

> (2) The depositary bank warrants to collecting banks, the payor bank or other payor, and the drawer that the amount

of the item was paid to the customer or deposited to the customer's account.

(Emphases added). The Majority is correct that this provision was intended to make clear that the depositary bank obtains the rights of a holder. The problem here is that this section of the Code is inapplicable to the facts of this case. Lema did not deliver the check to the Bank, nor apparently did an agent. In addition, Lema was never a "holder" of the instrument, and therefore the Bank could not acquire holder rights through him. A "holder" is defined by § 1–201(20), in relevant part, as follows:

"Holder" with respect to a negotiable instrument, means the person in possession if the instrument is payable to bearer or, in the case of an instrument payable to an identified person, if the identified person is in possession.

The undisputed facts are that Lema never possessed the check. Because Lema was never in possession, Lema was never a "holder;" thus Lema had no rights as a "holder" to be transferred to the Bank. Whether Lema may be held liable for activities occurring in his accounts under a contract theory is a different question, addressed *infra*, from that of liability on the check under the UCC. As powerful as the Majority wishes to make the Bank's Deposit Agreement with Lema, the Agreement nevertheless lacks the power to confer rights of a "holder" upon Lema in an instrument never possessed or endorsed by Lema as required by the Code. Section 4–205 is not applicable to the facts of this case, and therefore does not create a conflict with § 3–401. Thus, § 3–401 controls the facts of this case.

Nor is § 4–401(b) applicable to the facts of this case. Section § 4–401(b) states: "A customer is not liable for the amount of an overdraft if the customer neither signed the item nor benefitted from the proceeds of the item." Official Comment 2 to that section informs us that: "Subsection (b) adopts the view of case authority holding that if there is more than one customer who can draw on an account, the nonsigning customer is not liable for an overdraft unless that person

benefits from the proceeds of the item." The issue before this Court is the alteration of a check, not an overdraft. Furthermore, this is not a situation where there are multiple parties drawing checks on the account; nor is this a factual situation where Lema can be cast in the role of a drawer responsible for the drawing of the instrument in question.[4] Thus, § 4–401(b) is not applicable to the facts of this case, and no conflict exists between it and § 3–401. Section 3–401 applies to the instrument.

The unanswered question remains, however, that if I am correct and Lema is not liable under Title 3 of the Code for the altered check, who, if anyone, is? I address this question only because, contrary to the apparent belief of the Majority, this case does not present a circumstance unprovided-for by the Code. Though the issue is not before us, and I in no way argue that the Court properly could reach it, the answer to this question is contained in the Code and in the instrument itself. The check was drawn by an Italian bank, Cassa di Risparmio di Padova e Rovigo, on its account at the Bank of New York. A copy of the check was contained in the record, and an examination of it is revealing of more than the alteration. Though the copy is less than perfectly legible, there appears to be no expression of the amount of the check written in script. There is merely a long rectangular box near the upper right-hand corner for the placement of numbers indicating the amount. There is sufficient space for at least twenty (20) digits. Inside this rectangle, starting from the left margin, is typed the letters "USD", indicating that the check

---

4. Additionally, Lema neither signed nor benefitted from the alteration. It is true that Lema transferred $2,000 to another of his accounts as payment of a debt owed to him. As Bank of America correctly pointed out in its brief, however, § 3–407 recognizes that an altered check still may be enforced as to its original terms. In this case, the correct amount was $3,000, later altered to $63,000 by a third party. Arguably, if one accepts the position of the Majority that Lema has an interest in the instrument itself, Lema would be entitled to enforce the instrument up to the amount of $3,000, even after the alteration. As noted, Lema only took $2,000 for himself. It could be argued fairly that only if Lema took more than $3,000 could Lema be said to benefit from the alteration.

is to be paid in U.S. Dollars. Inside the rectangle, from the right margin, are the numbers "63,000.00." Because these numbers start at the right margin, reading to the left, there is a large space of at least one inch between the letters "USD" and the amount of "63,000.00." Obviously, there was even more additional space available when the check was drawn originally for "3,000.00." The point is that the lay-out of the check is such that it facilitated alteration. The perpetrator of an alteration merely has to place the instrument into a printer or typewriter and type in a number to the left of the original amount, thus increasing its value.

Section 3–406 states:

(a) A person whose failure to exercise ordinary care substantially contributes to an alteration of an instrument or to the making of a forged signature on an instrument is precluded from asserting the alteration or the forgery against a person who, in good faith, pays the instrument or takes it for value or for collection.

(b) Under subsection (a), if the person asserting the preclusion fails to exercise ordinary care in paying or taking the instrument and that failure substantially contributes to loss, the loss is allocated between the person precluded and the person asserting the preclusion according to the extent to which the failure of each to exercise ordinary care contributed to the loss.

(c) Under subsection (a), the burden of proving failure to exercise ordinary care is on the person asserting the preclusion. Under subsection (b), the burden of proving failure to exercise ordinary care is on the person precluded.

Section 3 of the Official Comment to § 3–406 offers several illustrative examples of "the kind of conduct that can be the basis of a preclusion under [the] section", of which "Case # 3" is applicable to the present matter. "Case # 3" explains:

A company writes a check for $10. The figure "10" and the word "ten" are type-written in the appropriate spaces on the check form. A large blank space is left after the figure and the word. The payee of the check, using a typewriter with a typeface similar to that used on the check,

writes the word "thousand" after the word "ten" and a comma and three zeros after the figure "10." The drawee bank in good faith pays $10,000 when the check is presented for payment and debits the account of the drawer in that amount. The trier of fact could find that the drawer failed to exercise ordinary care in writing the check and that the failure substantially contributed to the alteration. In that case the drawer is precluded from asserting the alteration against the drawee if the check was paid in good faith. In short, assuming *arguendo* that Bank of America was obliged to return the funds to the Bank of New York (an assumption that is not a certainty on this record), a proper party from which Bank of America may seek recompense on the check was the Italian bank. Perhaps viewing such an action as an expensive proposition to litigate, given the amount involved, Bank of America instead sought to enforce its asserted contract rights against its account holder, and to do so on a basis which would expand greatly the powers of such contracts if Bank of America's arguments were accepted by this Court. The Majority opinion grants the Bank this undeserved double victory.

## II.

The Majority is correct when it states that the UCC expressly allows many of its terms to be modified by private agreement. Given that having a bank account is a virtual necessity in our society and the unequal bargaining power between banks and the majority of their customers, if the Code did not allow expressly for these agreements the argument fairly could be made that such contracts as the one before us are textbook examples of contracts of adhesion. It is for this reason that the Code does not recognize agreements purporting to alter certain of the provisions of the UCC, and makes certain duties and obligations non-waivable.[5] For example, § 4–103(a) states:

---

5. Additionally, § 1–203 states: "Every contract or duty within Titled 1 through 10 of this article imposes an obligation of good faith in its performance or enforcement."

The effect of the provisions of this title may be varied by agreement, **but the parties to the agreement cannot disclaim a bank's responsibility for its lack of good faith or failure to exercise ordinary care or limit the measure of damages for the lack or failure.** However, the parties may determine by agreement the standards by which the bank's responsibility is to be measured if those standards are not manifestly unreasonable.

(Emphases added). Similarly, § 1–102(3) states:

The effect of provisions of Titles 1 through 10 of this article may be varied by agreement, except as otherwise provided in Titles 1 through 10 of this article and **except that the obligations of good faith, diligence, reasonableness and care prescribed by Titles 1 through 10 of this article may not be disclaimed** by agreement but the parties may by agreement determine the standards by which the performance of such obligations is to be measured if such standards are not manifestly unreasonable.

(Emphases added).

The Majority concludes that the Deposit Agreement in question acts to change "the legal consequences which would otherwise flow from the provisions of the [UCC]," and thus allows the Bank to charge back against Lema's account where under § 4–214 that possibility might not exist.(Maj. slip op. at 642). As a result, the Majority affirms the Court of Special Appeals decision reversing the trial court's entry of judgment in favor of Lema. Even if I were to accept the Majority's reasoning regarding the impact of the parties' contract, which I do not, the result would not be as suggested by the Majority.

The Majority opinion asserts that the outcome of this case is determined by clause 4(e) of the Deposit Agreement. (Maj. slip op. at 640–43). This clause reads as follows:

**e. Items returned.** If a deposited item is returned to us by the bank on which it is drawn, we may accept that return and charge the item back against your account without regard to whether the other bank returned the item before its midnight deadline. At our option and without notice to

you that the item has been returned, we may resubmit any returned item for payment. **You waive notice of dishonor and protest, and agree that we will have no obligation to notify you of any deposited item that is returned to us. Unless prohibited by applicable law or regulation, we also reserve the right to charge back to your account the amount of any item deposited to your account or cashed for you which was initially paid by the payor bank and which is later returned to us due to an allegedly forged, unauthorized or missing endorsement, claim of alteration, encoding error or other problem which in our judgment justifies reversal of credit.** We may process a copy or other evidence of a returned item in lieu of the original.

(Emphasis added). The Majority overlooks that this provision contains elements implicating the Bank's duty to exercise ordinary care, the waiver of which duty is prohibited by the Code. It overlooks that the Code places the burden of proof for those elements squarely on Bank of America. (Maj. slip op. at 640 n. 10).

Under § 4–105(2) and (5), Bank of America is, under the facts of this case, both a "depositary bank" and a "collecting bank." Under § 4–202(a)(2), a collecting bank must exercise **ordinary care** in "sending notice of dishonor or nonpayment or returning an item other than documentary draft to the bank's transferor after learning that the item has not been paid or accepted, as the case may be." Under § 4–202(b), "[a] collecting bank exercises ordinary care under subsection (a) by taking proper action before its midnight deadline following receipt of an item, notice, or settlement. Taking proper action within a reasonably longer time may constitute the exercise of ordinary care, but the bank has the burden of establishing timeliness." Notice, under § 4–105, is a part of the exercise of ordinary care and, under § 4–103(a) *supra*, the duty to exercise ordinary care may not be disclaimed by agreement between the parties. Thus, the provisions of clause 4(e) of the Deposit Agreement purporting to waive the notice requirement are void as against public policy. As such, the Bank has

the burden to show that it gave notice to Lema within a reasonable time; otherwise, it is liable for resulting damages as defined by § 4–103(e).[6] The Court of Special Appeals failed to recognize this, and thus it would be incorrect, even under the Majority's contract theory, for this Court to simply affirm the decision of the intermediate appellate court in this case.

The undisputed facts in this case are that the Bank of New York forwarded to Bank of America a "Notice of Forgery Claim" on 12 January 2000. Bank of America did not inform Lema that it was charging his account $60,000 until 22 February 2000, forty (40) days after the midnight deadline[7] for ordinary care as required by § 4–202. Because Bank of America missed its midnight deadline for giving Lema notice, it bears the burden of proving that a 40 day delay was reasonable; a burden, as pointed out, which it may not avoid by private contract. Contrary to the opinion of the Majority (slip. op at 640 n. 10), it is not necessary that Lema raise the issue of lack of ordinary care. The burden of proof that its actions were reasonable and that it therefore is entitled to the full amount is placed on the Bank by § 4–202. Bank of America presented no evidence to show that the 40 day delay in giving notice was reasonable under § 4–202. As a result, even if the Majority's interpretation of the effect of the Deposit Agreement were correct, a simple affirmance of the decision of the intermediate appellate court is error.

### III.

The problems addressed in sections I and II of this Dissent illustrate the errors in the Majority opinion in its relation of

---

**6.** Additionally, see § 4–214 and corresponding Official Comments 5 and 6.

**7.** Section 4–104(10) supplies the following relevant definition: " 'Midnight deadline' with respect to a bank is midnight on its next banking day following the banking day on which it receives the relevant item or notice or from which the time for taking action commences to run, whichever is later."

the UCC to the facts of this case. Those errors are ultimately of little consequence to the determination of this case, however, as the Majority opinion does not decide the case on UCC principles, but rather upon general contract principles. Here also I depart from the analysis and conclusions of the Majority opinion in a number of substantive ways, although there are some points it makes with which I agree. I agree with the conclusion of the Majority that "Title 3 is not the only applicable law; Title 4 deals with 'Bank Deposits and Collections' and also is applicable in this case" (Maj. slip op. at 639). I also agree with the Majority's conclusion that the Deposit Agreement is not ambiguous. (Maj. slip op. at 644). I disagree, however, with the conclusion of the Majority that the Deposit Agreement functions to change the legal consequences which otherwise would flow from the provisions of the Code (*id.*). On the contrary, the plain meaning of the unambiguous language of the contract clause in question, clause 4(e), indicates that, far from altering the Code by agreement, the terms used incorporate the Code in its entirety into the Agreement.

Construction of a contract is, in the first instance, a question of law for the court to resolve. *Suburban Hosp. v. Dwiggins,* 324 Md. 294, 306, 596 A.2d 1069, 1075(1991). There is no room for construction where the language of a contract is clear and unambiguous, and we "must presume that the parties meant what they expressed." *Gen'l Motors Acceptance Corp. v. Daniels,* 303 Md. 254, 261–62, 492 A.2d 1306, 1310 (1985). The question presented by this case is whether the terms of the Deposit Agreement were meant to substitute for the provisions of the Code, or merely act as gap fillers. Bank of America seems to argue at one point, contrary to the conclusion of the Majority, that the contract was not intended to vary the terms of the UCC (Brief at 17). The Bank there states:

> The charge-back provision in the Deposit Agreement does not "eliminate the protections of Title 3" as suggested by Appellant. If the language varies the effect of Title 3, such variation is permitted under Title 4. However, **Bank of America submits that the text does not vary the terms of**

**the UCC** Both lower courts determined that Appellant had not ratified the deposit and, therefore, was not liable under Title 3. Therefore, the Bank's invocation of Title 3 did not change anyone's liabilities. Rather, in this instance, the text addresses this unique situation that falls outside the limits of the UCC.

(Emphases added; internal citations omitted). While Bank of America is correct that the text of the Deposit Agreement does not vary the terms of the UCC, it is incorrect in asserting that the text addresses a unique situation outside the provisions of the UCC. In fact, the plain language of the Deposit Agreement specifically states that the UCC, as the applicable law, shall apply.

As I noted *supra*, I agree with the Majority that Title 3 and Title 4 are the applicable law. I also agree that the relevant contract provision is 4(e), which states in relevant part:

**Unless prohibited by applicable law or regulation,** we also reserve the right to charge back to your account the amount of any item deposited to your account or cashed for you which was initially paid by the payor bank and which is later returned to us do to an allegedly forged, unauthorized or missing endorsement, claim of alteration, encoding error or other problem which in our judgment justifies reversal of credit.

(Emphases added). My difference with the Majority opinion is that after recognizing Title 4 as the applicable law, the Majority failed to apply it as required by clause 4(e) of the contract.

Because Titles 3 and 4 are the applicable law, we must interpret the first clause of 4(e) as reading "Unless prohibited by applicable law [which, by definition, includes the provisions of Titles 3 and 4] or regulation...." Because Title 4 is the applicable law, and the right of charge-back granted to the Bank contained in clause 4(e) is conditioned upon such charge-back not being prohibited by the applicable law, then if a section of Title 4 prohibits such a charge-back, that section of Title 4 controls the right of the Bank to charge-back the

customers account. Section 4–214 is such a section, and states in relevant part that "rights to revoke, charge-back, and obtain a refund terminate if and when a settlement for the item received by the bank is or becomes final." Section 4–214 being the applicable law under the terms of the contract, Bank of America is precluded by the terms of the contract from charging-back the account if the payment of the check to the account was final, as opposed to provisional. *Boggs v. Citizens Bank and Trust Co. of Maryland*, 32 Md.App. 500, 505, 363 A.2d 247, 250 (1976)(holding that where settlement of an item becomes final, a bank is not permitted under § 4–214 to charge back a customer's account).

The question comes down to whether the credit to Lema's account was provisional or final. My review of the record extract indicates that Bank of America produced no evidence as to whether its release of funds was provisional or final. All that was shown was that the deposit was made on 24 November 1999, and that no withdrawals were made until the check had "cleared." Lema testified that, after discovering that the deposit had been made, he spoke to a customer service employee of the Bank, one Weise Price, and that that person informed him that the item would be paid after the item was collected, and that that would take about 17 days. This testimony is uncontradicted by the Bank.

For purposes of appellate review, the state of the record is unfortunate. Nevertheless, Bank of America is the party asserting its rights under the Deposit Agreement and, thus, Bank of America has the burden of establishing its right to do so, which includes producing evidence establishing that the release of funds to Lema's account was provisional, and that final settlement had not occurred prior to the date of the charge-back. "In Maryland, as in the majority of States, it is the rule, in either breach of contract or tort cases, that the burden of proof is on the plaintiff, or on the party who asserts the affirmative of an issue, and that burden never shifts." *Kruvant v. Dickerman*, 18 Md.App. 1, 3, 305 A.2d 227, 229 (1973). Bank of America failed to meet its burden here.

For the forgoing reasons, the judgment of the Court of Special Appeals, in my opinion, should be reversed, and the judgment of the trial court affirmed.

Chief Judge BELL and Judge ELDRIDGE have authorized me to state that they join in this dissent.